SEYMOUR TEITELBAUM & another[1] *vs.* HALLMARK CARDS
INCORPORATED & another.[2]

No. 87-495.

Berkshire. February 16, 1988. — April 1, 1988.

Present: GREANEY, C.J., SMITH, & FINE, JJ.

*Practice, Civil,* Directed verdict, Findings by judge. *Contract,* What con-
stitutes, Termination. *Estoppel. Uniform Commercial Code,* Sale of
goods, Unconscionability. *Consumer Protection Act,* Businessman's
claim, Unfair act or practice.

At the trial of claims seeking damages for breach of contract and "promissory
estoppel" arising out of defendants' alleged violation of their obligation
to supply plaintiffs with inventory for their greeting card store, the judge
properly allowed the defendants' motion for a directed verdict where,
on the evidence considered most favorably to the plaintiffs, the jury
could have found that an oral agreement falling within G. L. c. 106,
§ 2-309, had been reached providing for periodic shipments of inventory
on an open account basis for an indefinite but reasonable period of time
and that, since the plaintiffs were able to obtain another supplier before
the defendants' performance became due, the plaintiffs received reason-
able notice and did not incur harm for lack of a supplier; where nothing
in the evidence warranted a finding of unconscionability; and where the
evidence supported neither the plaintiffs' contention that custom and
usage in the greeting card industry called for a contract of longer duration
than that specified by § 2-309, nor their contention that principles con-
tained in § 90(1) of the Restatement (Second) of Contracts created a
legally binding arrangement that would continue until the plaintiffs ter-
minated it. [559-562]
In an action for damages and attorney's fees for alleged violations of G. L.
c. 93A, §§ 2(*a*) and 11, arising out of defendants' alleged violation of
their obligation to supply plaintiffs with inventory for their greeting card
store, the judge's findings, placing emphasis on the absence of any
written agreement, the lack of any obligation on the plaintiffs' part to
purchase merchandise from the defendants, negotiations between the
parties marked by tentativeness on the defendants' part, and a written dis-

[1] Sylvia Teitelbaum.

[2] Hallmark Marketing Corporation.

claimer from the defendants advising the plaintiffs that their discussions were not to be taken as conclusive or binding on the defendants, warranted his conclusion that the plaintiffs failed to prove that the defendants were guilty of any unfair or deceptive practice in their conduct toward the plaintiffs. [562-563]

CIVIL ACTION commenced in the Superior Court Department on September 17, 1981.

The case was tried before *John F. Murphy, Jr.*, J.

*David W. Murphy, Jr.*, for the plaintiffs.

*John A. Agostini* for the defendants.

GREANEY, C.J. In this action in the Superior Court, the plaintiffs asserted that the defendants violated their obligation to supply the plaintiffs with inventory for the plaintiffs' greeting cards store in Pittsfield. Damages were sought from a jury on common law claims of breach of contract and "promissory estoppel," and damages and attorney's fees were sought from a judge for alleged violations of G. L. c. 93A, §§ 2(*a*) and 11. At the conclusion of the evidence presented to the jury on the common law claims, the judge allowed the defendants' motion for a directed verdict. He then heard additional evidence on the c. 93A claim. He prepared a memorandum of decision which explained why he had allowed the defendants' motion for a directed verdict. The memorandum also contained findings of fact and conclusions of law on the c. 93A claim and ultimately concluded that the defendants had not acted unfairly or deceptively in their dealings with the plaintiffs. We affirm the judgment for the defendants.

In reviewing the granting of a directed verdict in a civil case, we consider the evidence in the light most favorable to the plaintiffs to ascertain whether any combination of circumstances can be found which would warrant a reasonable inference in their favor. *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984). On the evidence, the jury could have found the following facts.

The plaintiffs are the owners of Richman's Card & Party Shop on North Street in Pittsfield. They acquired the store in July, 1976, from Arnold Richman, who had purchased a large percentage of the store's greeting cards, gifts, and other inven-

tory from the defendants. After buying the store, the plaintiffs continued to purchase about ninety percent of their inventory from the defendants. The remaining ten percent was purchased from four other companies selling greeting cards and related merchandise. The plaintiffs' dealings with the defendants (and their other suppliers) were on an "open account" basis; that is, the plaintiffs were under no obligation to purchase any merchandise from their suppliers, and they could terminate their relationship with any supplier anytime. Bills sent by the defendants were always paid promptly, and the store was kept in satisfactory condition.

On November 17, 1980, a fire destroyed the store. The plaintiffs rented a temporary location where they sold the merchandise salvaged from the fire. About one month later, this location was closed, and the defendants closed the plaintiffs' account.[3]

Discussions then began between the plaintiffs, representatives of the defendant corporations, and the plaintiffs' former lessor about the reopening of the store at the North Street site. Also discussed was the possibility of reopening at other locations. At a meeting in December, 1980, the parties agreed that the plaintiffs could return to the North Street location. The plaintiffs were represented by counsel during these discussions.

In February, 1981, the plaintiffs were advised by a representative of the defendants that someone intended to open another store on North Street which would sell Hallmark products. The defendants also advised that they would no longer sell merchandise to the plaintiffs at the North Street location because the defendants had determined that the new store would give Hallmark adequate distribution of its products in the area. The defendants' representative suggested to the plaintiffs other sites for stores in Great Barrington and North Adams at which the defendants would consider selling to the plaintiffs. Relocation to another community was rejected by the plaintiffs. In March and April, 1981, the plaintiffs ordered cards and other inventory

---

[3] The parties agree that there is a credit balance of $436.08 in the account which is due the plaintiffs and which will be paid by the defendants upon request.

from the American Greeting Card Company, intending to reopen with this company as their principal supplier. American accepted the order.

On May 3, 1981, the plaintiff Sylvia Teitelbaum wrote to the defendants' attorney complaining about what she perceived as the defendants' shabby treatment of the plaintiffs, who had been good customers. The letter asked the defendants to reconsider the decision not to sell Hallmark products to the plaintiffs at the North Street location and also requested a meeting with the defendants' representatives. The defendants' counsel replied by letter on May 18, 1981. In that letter, counsel indicated that the defendants would not commit themselves to opening another account at the North Street location but agreed to a meeting between the plaintiffs and the defendants' representatives to discuss the plaintiffs' plans for opening a new store. The letter further advised the plaintiffs that they should not rely on any discussions with the defendants' representatives as indicating a promise on the defendants' part to sell to the plaintiffs at the North Street location.

On June 4, 1981, the defendants' representatives met with the plaintiffs. The upshot of the meeting was an offer by the defendants' representatives to sell inventory to the plaintiffs on the conditions that: the plaintiffs (a) carry exclusively Hallmark products and (b) permit the defendants, in their discretion, to ship product lines that the plaintiffs had not previously carried. The plaintiffs accepted those terms. Floor measurements were taken of the North Street site, and a financial statement was requested from the plaintiffs. Based on the discussions at the meeting, the plaintiffs cancelled their order with the American Greeting Card Company.

On June 11, 1981, the plaintiffs met again with the defendants' representatives to review a proposed floor plan of the North Street store. The defendants rejected the plaintiffs' request to place a deposit on fixtures for the store. Despite this, the defendants' representatives indicated to the plaintiffs that "everything was go" for the reopening of the store. Another meeting was scheduled for June 25, 1981. That meeting was cancelled by the defendants' store planner.

On July 8, 1981, the defendants' representatives advised the plaintiffs that they intended to do business with another store owner at a different location on North Street and would not sell merchandise to the plaintiffs at their former location on North Street. Notwithstanding this news, the plaintiffs subsequently signed a five-year lease, with options to extend, with their former lessor at their former location on North Street. (The plaintiffs concede that they were not legally obligated to sign the lease but chose to anyway). The store reopened in September, 1981. Since then the plaintiffs have been selling merchandise purchased from the American Greeting Card Company and other suppliers.

1. The plaintiffs argue that, by June 4, 1981, the defendants had obligated themselves to supply the plaintiffs with inventory for their store at North Street for an indefinite period. According to the plaintiffs, the oral understanding that had been reached required the plaintiffs to sell Hallmark merchandise exclusively, including any products that Hallmark wanted them to sell. The defendants, in turn, had agreed to supply the merchandise on the "open account" basis that had existed prior to the fire, viz., monthly orders and shipments, prompt payments on invoices, etc. The plaintiffs maintain that the commitments on the defendants' part arose either by contract (the exchange of the mutual promises outlined above) or by the application of the doctrine of promissory estoppel to the defendants' conduct (as that doctrine is outlined in § 90[1] of the Restatement [Second] of Contracts [1981]).[4]

There never was any written agreement. We do not accept the contention (which was not developed at trial) that a franchise agreement existed. The dealings between the parties had involved, and were to continue to involve, "transactions in goods" governed by the Uniform Commercial Code, G. L. c. 106,

---

[4] That section provides: "(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." See *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 376 Mass. 757, 760-761 (1978).

§ 2-102, inserted by St. 1957, c. 765, § 1. On the evidence considered most favorably to the plaintiffs, we think that the jury could have found that an oral agreement had been reached between the parties providing for periodic shipments of inventory by the defendants to the plaintiffs on an open account basis for an indefinite but reasonable period of time. Performance of such an agreement is governed essentially by the following provisions of G. L. c. 106, § 2-309, inserted by St. 1957, c. 765, § 1:

> "(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.
>
> "(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."

These provisions codify common law principles that existed before the adoption of the Uniform Commercial Code. See *Emerson* v. *Ackerman*, 233 Mass. 249, 252 (1919); *Livingston* v. *George McArthur & Sons*, 332 Mass. 83, 86 (1954).

Since there was no express agreement preventing termination, the arrangement that existed was terminable at the will of either party at any time upon reasonable notice. Thus, the question on appeal from the granting of the motion for a directed verdict is whether the notice given on July 8, 1981, was "reasonable." In many cases, the issue of the adequacy of notice of termination will present a jury question. In this case, it does not.

The reasonableness of notice of termination in agreements falling within § 2-309, is measured in terms of the ability of the party affected by the termination to obtain a substitute arrangement. See official comment 8 to § 2-309, 1 Uniform Laws Annot., U.C.C. 292 (Master ed. 1976). See also *Superior Foods, Inc.* v. *Harris-Teeter Super Mkts., Inc.*, 288 N.C. 213,

222 (1975); *Zidell Explorations, Inc.* v. *Conval Intl., Ltd.,* 719 F.2d 1465, 1473 (9th Cir. 1983); *Aaron E. Levine & Co.* v. *Calkraft Paper Co.,* 429 F. Supp. 1039, 1050 (E.D. Mich. 1976). If that party is able to obtain another supplier before the performance of the party effecting termination becomes due, then it necessarily follows that the terminating party has furnished reasonable notice and will not be responsible for damages. Put another way, the adequacy of the notice is generally coextensive with the amount of harm that can be proved by the party who has incurred the loss of a supplier.

The evidence is uncontroverted that, by the time the plaintiffs reopened their store, according to the schedule for reopening that they had chosen, they had acquired a full line of inventory, principally from the American Greeting Card Company, a supplier that had furnished some of their merchandise before the fire and had agreed to furnish the bulk of the inventory needed by the plaintiffs after the defendants' initial refusal to continue the preexisting arrangement. The plaintiffs did not incur harm for lack of a supplier.

It is conceded that, at the time of the termination, the plaintiffs were not obligated to sign the new lease but proceeded to do so voluntarily after they had made a conscious choice to reopen at the North Street location with a new supplier. Upon request, the defendants will pay the small credit due the plaintiffs on their closed account, see note 3, *supra.*

Apart from these considerations, we perceive nothing in the evidence to warrant a finding of unconscionability, a question which is one of law for the court. G. L. c. 106, § 2-302(1). We reject the argument that the plaintiffs are entitled to damages for lost profits as a result of not being able to sell the Hallmark line of products, which they consider superior to any other line of products. Acceptance of this argument would render § 2-309 virtually meaningless in a case in which reasonable termination notice has been given in the sense described above. Finally, on the evidence in the case, we reject the plaintiffs' argument that custom and usage in the greeting card and gift industry calls for a contract of longer duration than that specified by § 2-309, see *Superior Foods, Inc.* v. *Harris-Teeter*

*Super Mkts., Inc.*, 288 N.C. at 222, 226, and their additional contention that the principles contained in § 90(1) of the Restatement (Second) of Contracts, note 4, *supra*, created a legally binding arrangement that would last until the plaintiffs either terminated it or stopped paying their bills.[5] The allowance of the defendants' motion for a directed verdict was proper.

2. The c. 93A aspect of the case was heard by the judge, who made separate findings of fact and conclusions of law. The findings of fact are supported by the evidence, except for one or two findings that are of no consequence to the result. See *Edinburg* v. *Cavers*, 22 Mass. App. Ct. 212, 218-219 (1986). The judge concluded that the "plaintiffs have failed to prove that the defendant[s were] guilty of any unfair or deceptive practice in [their] conduct toward the plaintiffs."

In reaching this conclusion, the judge placed emphasis on the absence of any written agreement, the lack of any obligation on the plaintiffs' part to purchase merchandise from the defendants, the prolonged discussions between the parties following the fire, which were consistently marked by tentativeness on the defendants' part, and the written disclaimer made in the letter of the defendants' counsel which advised the plaintiffs that discussions about a new arrangement were not to be taken as conclusive or binding on Hallmark.

Whether the defendants' conduct was unfair or deceptive was a matter of fact. *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). The plaintiffs were not commercial innocents. They never bothered to obtain a written franchise or other agreement that might bind the defendants to a fixed and more enduring commercial relationship. The parties retained the right to stop doing business with each other if a better opportunity ever presented itself. The record conveys no impression of oppressiveness. On the contrary, the plaintiffs' claim of the existence of an agreement that might continue well into the next century is thoroughly unconvincing. Comparison may be had to *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284 (1980),

---

[5] No adequate argument was made below or is made here that the defendants' conduct violated any antitrust law.

in which the defendant terminated an ongoing franchise agreement, as provided in the written agreement, on ninety days' written notice. The plaintiffs in that case presented stronger evidence favoring recovery than the plaintiffs presented here. Yet, the court found that no violation of c. 93A had occurred. We agree with the judge that the plaintiffs did not make out a case for recovery under G. L. c. 93A, §§ 2(*a*) and 11.

*Judgment affirmed.*