USCA1 Opinion

 

 March 1, 1995 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1711 SAS OF PUERTO RICO, INC., Plaintiff, Appellant, v. PUERTO RICO TELEPHONE COMPANY, Defendant, Appellee. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on February 21, 1995, is amended as follows: On page 8, line 18, the word "pendant" should be "supplemental". On page 10, note 2, the footnote should read: "Illinois Brick ______________ Co. v. Illinois, 431 U.S. 720 (1977). Compare Hanover Shoe, Inc. v. ___ ________ _______ ___________________ United Shoe Mach. Corp., 392 U.S. 481 (1968).". _______________________ Page 10, note 4, line two of note, "Brunswich" should be "Brunswick". UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-1711 SAS OF PUERTO RICO, INC., Plaintiff, Appellant, v. PUERTO RICO TELEPHONE COMPANY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin, Circuit Judge, _____________ and Boyle,* Senior District Judge. _____________________ ____________________ Laurence Z. Shiekman with whom M. Duncan Grant, Frank M. ______________________ _________________ __________ Rapoport, Michael A. Ceramella and Pepper, Hamilton & Scheetz were on ________ ____________________ __________________________ brief for appellant. Philip J. Mause with whom Joaquin A. Marquez and Drinker Biddle & _______________ __________________ _________________ Reath were on brief for appellee. _____ ____________________ February 21, 1995 ____________________ ____________________ *Of the District of Rhode Island, sitting by designation. BOUDIN, Circuit Judge. SAS of Puerto Rico, Inc. ______________ ("SAS"), brought an antitrust suit in federal district court in Delaware against Puerto Rico Telephone Company ("PRTC"). After the suit was transferred to the district court in Puerto Rico, the district court granted PRTC's motion to dismiss on the ground that SAS did not adequately assert "antitrust injury." We agree and affirm. I. In April 1993 SAS filed its original complaint in Delaware district court. After the case was transferred to Puerto Rico, the site of most of the events that underlie the case, an amended complaint was filed. Since the amended complaint was later dismissed on the pleadings, we accept the allegations as true for purposes of this appeal. Berkovitz _________ v. United States, 486 U.S. 531, 540 (1988). What follows is _____________ SAS's version of the facts, supplemented by information not reasonably disputable. PRTC is a Delaware corporation that provides about 90 percent of the telephone service within Puerto Rico and operates over 95 percent of the pay phones in Puerto Rico. Although once a subsidiary of ITT, all of the stock of PRTC was acquired about 20 years ago by the Puerto Rico Telephone Authority ("the Authority"), a public corporation and government instrumentality of the Commonwealth. The Authority also owns the stock of the Puerto Rico -2- -2- Communications Corporation ("PRCC") which provides telephone service and operates pay phones in those areas of Puerto Rico not served by PRTC. (PRTC's brief says that it and PRCC have now merged.) Long distance service between Puerto Rico and the U.S. mainland was for some years provided by an ITT subsidiary interconnecting on the mainland with AT&T, but in the 1980's the Federal Communications Commission took steps to facilitate competition for Puerto Rico's long distance traffic.1 To participate in this new environment, the Authority created yet another wholly owned subsidiary called Telfonica Larga Distancia ("TLD"). In 1990, the Commonwealth adopted legislation designed to facilitate the Authority's sale of TLD's stock. After its formation, TLD rapidly became the carrier for about 80 percent of the long distance telephone calls made from pay phones in Puerto Rico. Although the mechanics are not described in the complaint, they can readily be inferred. Pay phones are commonly located on streets or other public property by the local telephone company or they may be located on private property such as in a store or hotel lobby; in the latter instance, the instrument is usually  ____________________ 1E.g., All America Cables & Radio, Inc. v. FCC, 736 F.2d ____ ________________________________ ___ 752 (D.C. Cir. 1984); Common Carrier Facilities Off of the ______________________________________ Island of Puerto Rico, 2 F.C.C.R. 6600 (1987), on recons., ______________________ __________ FCC 92-529 (1992). -3- -3- (although not always) furnished by the local telephone company by arrangement with the property owner. As long distance competition developed over the past three decades, telephone subscribers have ordinarily been able to select the long distance carrier through which their calls would be routed. A small percentage of modern pay phones make it easy for the caller to select his or her preferred long distance carrier by pushing a single button; but in many pay phones, a pre-designated long distance carrier automatically receives the traffic unless the caller "dials" a complex access code to reach another long distance carrier. According to the complaint, in Puerto Rico many of the pay phones used (or were connected through) older technology that prevented a caller from using a long distance carrier-- other than the pre-designated one--except by the cumbersome means of calling an operator and asking to be routed to a different long distance carrier. The pre-designated carrier for a pay phone is normally selected by the local telephone company or the premises owner. In short order TLD began to carry most of the long distance calls from Puerto Rico pay phones. SAS was formed as a Puerto Rico corporation in 1991 in the hope of contracting with PRTC and PRCC to upgrade equipment and maintain service at Puerto Rico's pay phones. -4- -4- The complaint explains that "[t]he principals of SAS were experienced in the installation and operation of `intelligent paystations' and, in fact, had successfully assisted in improving the pay phone system in the United States Virgin Islands." Such intelligent pay phones, embodying what are effectively computers, can provide various advantages to callers (e.g., speed dialing) and to the local telephone ____ company (e.g., remote diagnosis of failure). ____ The intelligent pay phones to be supplied by SAS would also increase competition among long distance carriers. SAS expected to negotiate with such carriers, as agent for the local telephone company or premises owner, presumably to secure the most favorable terms for the position of pre- assigned long distance carrier at the pay phone. In addition the intelligent pay phone would greatly simplify the task of the caller who desired to route his or her own call through a long distance carrier other than the pre-assigned carrier. On January 31, 1992, after "substantial negotiation and investment of considerable time and money," SAS signed an "agency agreement" with both PRTC and PRCC to provide and maintain pay telephones in Puerto Rico. As to PRTC, the agreement provided for SAS to act as PRTC's agent to upgrade a minimum of 1,500 of PRTC's pay phones at tourist and business centers. The agreement included authority for SAS to negotiate with the premises owner to alter the pre- -5- -5- designated long distance carrier for the intelligent pay phones to be installed on the premises. SAS hoped to obtain better terms from such carriers through competition. Ten days after the January 31 agreement, the Authority reached an agreement with Telefonica de Espana, the international subsidiary of Spain's telephone company, to sell it control of TLD. Part of the value of TLD lay in its position as the pre-designated long distance carrier at most of Puerto Rico's pay phones. This position was threatened by the SAS-PRTC agreement. According to the complaint, PRTC thereafter "engaged in a course of conduct designed to delay, disrupt and derail the installation of the 1,500 intelligent paystations in Puerto Rico." The complaint does not describe this conduct beyond asserting generally that PRTC failed to carry out unspecified obligations under the contract while making new demands on SAS. On June 18, 1992, SAS agreed with PRTC and PRCC to modifications in the original agreement and shortly thereafter PRTC told SAS to proceed with installation. SAS then obtained a $500,000 line of credit and began to purchase the new pay phone equipment. In October 1992 PRTC told SAS to stop operations. More negotiations followed and a second contract revision followed, but after further steps by SAS to implement the program, SAS was again instructed to halt work. -6- -6- In April 1993, SAS began the present lawsuit in the district court in Delaware, PRTC's state of incorporation. The complaint (as later amended) says that after the case began, PRTC in late 1993 or early 1994 sought bids to replace some or all of the pay phones that SAS had contracted to replace; PRTC later accepted one of the bids; and PRTC thereafter contracted for pay phones with some of the same manufacturers or suppliers who had agreed to supply them to SAS when the latter was seeking to fulfill its own contract with PRTC. The complaint alleges, in its first three counts, that the acts described constituted monopolization and attempted monopolization of two different markets and conspiracy to restrain trade in the same markets, all in violation of the Sherman Act. 15 U.S.C. 1-2. PRTC was alleged to have monopoly power in "the market for the provision of pay phone service in Puerto Rico"; and PRTC, PRCC and TLD as a "single economic entity" were alleged to have such power in "the market for the provision of long distance service from pay phones in Puerto Rico." In the antitrust conspiracy count Telefonica de Espana was named as a co-conspirator. In addition to the conduct already described, SAS alleged that PRTC had discussed with Telefonica de Espana the impact that the SAS upgrading of pay phones would have and that PRTC had impeded and delayed the -7- -7- agreement with SAS in order to avoid an adverse impact on the value of TLD. Additional counts of the complaint charged PRTC with fraud, breach of contract, and tortious interference with contracts between SAS and makers or suppliers of pay stations. On the antitrust counts, the complaint sought injunctive relief, treble damages and attorney's fees; on the non-federal counts, it asked for compensatory damages and attorney's fees. In the injunctive relief request, SAS asked that PRTC be required to complete its contract with SAS. After the transfer to Puerto Rico, SAS of Puerto Rico v. __________________ Puerto Rico Tel. Co., 833 F. Supp. 450 (D. Del. 1993), PRTC _____________________ moved to dismiss the antitrust claims on the ground that it was protected by the state action doctrine, see Parker v. ___ ______ Brown, 317 U.S. 341 (1943), or, in the alternative, that _____ antitrust injury had not been alleged. PRTC also contended that it was shielded from damage liability for antitrust violations by the Local Government Antitrust Act of 1984, 15 U.S.C. 34-36. In an opinion and order entered May 9, 1994, the district court rejected the state action and statutory arguments but dismissed the antitrust claims for lack of antitrust injury. Having found that SAS had failed to state a claim under the antitrust laws, the district court declined to exercise supplemental jurisdiction under state law as to the fraud, -8- -8- contract and tortious interference claims. See 28 U.S.C.  ___ 1367. An order was entered dismissing the complaint, and this appeal followed. Because we agree with the position on antitrust injury taken in the district court's opinion, we confine our discussion to that issue. -9- -9- II. Despite its statutory framework, antitrust law is largely the handiwork of federal judges and antitrust enforcers, and the resulting case law offers much to admire. The corner of antitrust law with which we are concerned here is an exception. As one commentator has observed, "the courts have never been able to create an intelligible theory of private antitrust standing capable of being applied across the full range of potential cases." H. Hovenkamp, Federal _______ Antitrust Policy 543 (1994). Cf. Associated General _________________ ___ ___________________ Contractors v. Carpenters, 459 U.S. 519, 536 (1983) (no black ___________ __________ letter rule). The underlying problem is not unique to antitrust law. Common law tort claims have been limited by various slippery rubrics (e.g., proximate cause), so that not everyone ____ remotely harmed by a violation is entitled to recover. From the outset, federal antitrust courts have devised counterpart limitations under various headings (e.g., standing, antitrust ____ injury) and through a variety of subordinate rules (e.g., ____ restrictions on suits by stockholders or indirect purchasers), metaphors (e.g., "inextricably intertwined," ____ "target area"), abstractions (direct versus remote injury), and multi-factor tests. See Associated General Contractors, ___ _______________________________ 459 U.S. 519; Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir. ________ _________ 1994). -10- -10- One reason for the confusion in antitrust cases is that courts sometimes have difficulty, well justified in certain cases, in separating standing or antitrust injury issues from two other problems: whether there has been an antitrust violation at all, and whether the plaintiff has suffered any injury causally (in the "but for" sense) related to the challenged conduct. Standing or antitrust injury involves a different concept: even where a violation exists and a plaintiff has been damaged by it, the courts--for reasons of prudence--have sought to limit the right of private parties to sue for damages or injunctions. The prudential concerns, however, are multiple, and the variety of situations endless. One set of limitations has been based on fear of duplicative recovery and excessively complex litigation.2 Another is concerned with the remoteness of the injury and the speculative character of the injury or the connection.3 Another set reflects an unwillingness to award antitrust damages to one who suffered from pro-competitive or irrelevant effects of an otherwise  ____________________ 2Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). ___________________ ________ Compare Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 _______ ___________________ ________________________ U.S. 481 (1968). 3Associated General Contractors, 459 U.S. at 543; Hawaii ______________________________ ______ v. Standard Oil Co., 405 U.S. 251, 262-63 n.14 (1972). ________________ -11- -11- anticompetitive transaction.4 These elements sometimes overlap; and the list is not exhaustive. It is not surprising that no simple rule has emerged for choosing the best antitrust plaintiff and deciding when second-best plaintiffs should be barred. Nevertheless, there are patterns in the antitrust standing cases that offer considerable guidance. One of those patterns involves the supplier who suffers because an ________ antitrust violation curtails a business that would otherwise have purchased from the supplier. In general such a supplier (including an employee who supplies labor) is held not to have suffered "antitrust injury"; while there may be a violation and causal harm to the supplier, the failed business is the immediate victim and the preferred plaintiff. II P. Areeda & H. Hovenkamp, Antitrust Law 375 (rev. ed. _____________ 1995) (collecting numerous cases). This is not because suppliers are automatically improper antitrust plaintiffs; a seller may well have a claim if victimized by a price-fixing ring composed of buyers that lowered the market price: in such a case the seller is a participant in the very market where competition is impaired. But if the supplier's customer fails because of an antitrust ________ violation, usually the conduct was deemed an antitrust  ____________________ 4Cargill v. Montfort of Colorado, 479 U.S. 104 (1986); _______ ____________________ Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 ________________ ________________________ (1977). -12- -12- violation because of the threat to the customer, not the supplier. Here, the situation is not quite parallel: SAS was not injured because its customer failed due to an antitrust violation by a third party; rather, the customer (PRTC) in the course of its own violation allegedly breached its agreement to use SAS as a supplier. But if the breach played a part in an antitrust violation, the conduct itself was an antitrust violation because of the anticompetitive threat posed to other potential plaintiffs, not SAS. Like the _____ happenstance supplier to a customer felled by a violation, SAS was coincidentally involved. SAS's complaint alleged that PRTC's conduct harmed or threatened harm to competition in two different markets: the provision of pay phone service in Puerto Rico and the provision of long distance service from such pay phones. Assuming arguendo that either or both is a proper "relevant ________ market" for antitrust purposes, Spectrum Sports v. McQuillan, _______________ _________ 113 S. Ct. 884, 892 (1993), the presumptively "proper" plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market. Associated General Contractors, 459 U.S. at 538-39. _______________________________ SAS is not suing in either capacity. SAS was not a premises owner aiming to obtain a better pay phone in its hotel or restaurant, or a caller who might -13- -13- use such a pay phone for ordinary or long distance service. Nor was SAS a competitor seeking access to the network for its pay phones in competition with the primary provider, PRTC; SAS' aim was to supply such phones to or for PRTC. Finally, despite some vague allusions in its brief, nothing in the complaint suggests that SAS was, or was about to become, a long distance carrier who might be benefitted by easier customer access. SAS argues that the district court failed to give it the benefit of a favorable reading of its complaint, and that it is entitled to such a reading. It says, in particular, that the district court chose to characterize the wrong as a simple contract claim rather than viewing it as a potential antitrust claim as well. Certainly, an individual act of misconduct can be the gravamen of more than one wrong to a single plaintiff. Not every antitrust claim in a contract case is simply a contract claim masquerading as a candidate for treble damages. But the problem here is not that a plaintiff is automatically limited to one cause of action. It is that the central conduct here involved--PRTC's failing to carry through a plan to broaden access--is wrongful as to SAS only _________ insofar as it may be a common (or civil) law wrong. Insofar as the same conduct is also an antitrust violation, that ____ violation does not infringe any interest of SAS protected by -14- -14- the antitrust laws. This is almost certainly all that the district court meant in saying that SAS's claim was really one for breach of contract. If competitors and consumers are favored plaintiffs in antitrust cases, the list of those presumptively disfavored is far longer. The list of those who may be derivatively injured, but are usually denied standing to sue includes "employees of the violator, and stockholders, creditors, landlords, and employees of victims." Hovenkamp, supra, at _________ _____ 554. It is hardly surprising to afford similar treatment to an incidentally injured supplier to a victim or, as here, the supplier to a supposed violator. But "presumptively" does not mean always; there can be exceptions, for good cause shown. See generally Sullivan, 25 F.3d at 49. _____________ ________ The most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive or ability to sue. Cf. Associated General Contractors, 459 U.S. ___ ______________________________ at 542. That is hardly likely here: those threatened by the market injury alleged by SAS include various potential plaintiffs, above all, long distance carriers, who should have ample incentive and ability to challenge violations that foreclose their access to customers. If there is any other reason for stretching to confer standing in this case on an -15- -15- incidentally connected plaintiff like SAS, it does not occur to us. We have concerned ourselves thus far primarily with the question whether SAS is a competitor or consumer in the market threatened by the alleged violation or has any other protectable interest under the antitrust law. But there is a second element in the antitrust standing cases that works against SAS in this case. As already noted, one of the reasons for limiting standing concerns the speculative character of either the injury or the relationship between the violation and injury. This concern may operate even in cases, like this one, where no duplicative recovery is threatened. Sullivan, 25 F.3d at 52. ________ At first blush it may seem as if PRTC's antitrust violation, if violation it was, clearly deprived SAS of whatever profits it might have made by carrying through the contract. But more carefully identifying the supposed violation raises substantial doubts. Assuming arguendo that ________ PRTC had or assumed some duty under the antitrust laws to upgrade its pay phones, it is not clear that the breach of that duty is meaningfully connected to the failure to carry through the contract with SAS. After all, supposing that the antitrust laws impose on PRTC a duty to upgrade, they certainly do not require that the upgrading be done by SAS or any other specific vendor. -16- -16- SAS would have been no less damaged if PRTC had breached the contract but installed improved pay phones of its own on the same timetable, thereby enhancing long distance competition. Conversely, once SAS got the contract and PRTC then allegedly breached it, SAS faced injury--but the injury would have existed even if no antitrust violation arose from the failure to upgrade. Thus, the connection here between "antitrust" and "injury" is suspect in more ways than one. It remains to say something about the Supreme Court's decision in Blue Shield v. McCready, 457 U.S. 465 (1982), on ___________ ________ which SAS relies heavily throughout its brief. There, by a five-to-four decision, the Supreme Court held that a consumer of health services could sue under the antitrust laws to redress a supposed conspiracy, between her insurance plan and Virginia psychiatrists, to exclude psychologists from receiving compensation under the plan. Although not the immediate target of the supposed boycott, McCready herself--a plan beneficiary who had used a psychologist and been denied reimbursement--was held to have standing under the antitrust laws. In language much stressed by SAS, the Supreme Court said that McCready's injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." 457 U.S. at 484. McCready is ________ also useful to SAS for a larger reason, namely, that it may -17- -17- be an instance in which standing was extended to a plaintiff who was only derivatively injured, there by an alleged boycott directed against psychologists for the benefit of psychiatrists. But McCready can also be read as a case in ________ which the plaintiff was a purchaser in the very market directly distorted by the antitrust violation, see Areeda & ___ Hovenkamp, supra, 364f, something that cannot even arguably _____ be said of SAS. Thus, the only real link between McCready and the ________ present case is the very general "inextricably intertwined" language of the former. It is doubtful that this language-- if taken as physical image--was ever intended as a legal test of standing. Quite apart from difficulties in application, such a test would certainly be very hard to square with the longstanding limitations on claims by stockholders, employees and even indirect purchasers. Nothing in McCready suggests ________ that it intended to overrule those limitations even though it would be very easy to describe such injuries as inextricably intertwined in the ordinary suggestive sense of the phrase In all events, the Supreme Court simply reinterpreted the phrase as a legal conclusion in Associated General ___________________ Contractors, saying (after a reference to the phrase): "In ___________ this case [Associated General Contractors], however, the ________________________________ Union was neither a consumer nor a competitor in the [restrained] market . . . ." 459 U.S. at 539. It did the -18- -18- same thing more recently in Atlantic Richfield v. USA ___________________ ___ Petroleum Co., 495 U.S. 328, 345 (1990) (injury not ______________ "inextricably intertwined" because competitor not injured by "the anticompetitive effects" of the challenged conduct). We _______________ do not think that anything more need be said about the matter. III. Having assumed throughout that an antitrust violation may have occurred, it is prudent to stress that this assumption is very much open to debate; the purported "essential facilities" doctrine is something less than a self-executing formula.5 We have also supposed the existence of causation of harm "in fact", see Sullivan v. ___ ________ NFL, 34 F.3d 1091, 1103 (1st Cir. 1994); but for reasons ___ suggested at the end of our standing discussion, a serious question exists whether the alleged "antitrust violation"-- when more carefully defined--can be described as the but-for cause of the harm suffered by SAS. In all events, even where there is a harm-causing antitrust violation, not every injured party is entitled to claim under the antitrust laws. In this case, supposing an antitrust violation occurred, it was not a violation directed against SAS and SAS is not an appropriate plaintiff to obtain  ____________________ 5See generally Interface Group, Inc. v. Massachusetts ______________ ______________________ _____________ Port Auth., 816 F.2d 9, 12 (1st Cir. 1987) (Breyer, J.); ___________ Hovenkamp, supra, 7 (critiquing the doctrine). _____ -19- -19- antitrust relief. SAS's remedies, if the allegations of the complaint are true, lie in contract and the other pertinent non-federal claims asserted in its complaint. Affirmed.  ________ -20- -20-