USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 99-1256

 THE SERPA CORPORATION,

 Plaintiff, Appellant,

 v.

 MCWANE, INC., ANACO, f/k/a ANAHEIM FOUNDRY COMPANY
 AND TYLER PIPE INDUSTRIES,

 Defendants, Appellees.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nancy J. Gertner, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

 Lynch and Lipez, Circuit Judges.

 _____________________

 Mitchell A. Kramer, with whom Kramer & Friedman was on brief,
for appellant.
 Margaret A. Lange, with whom Lawrence G. Green, and Perkins,
Smith & Cohen, LLP were on brief, for appellees.

 ____________________

 December 8, 1999
 ____________________ TORRUELLA, Chief Judge. Plaintiff The Serpa Corporation
brings this suit against defendant corporations McWane, Inc.,
Anaco, and Tyler Pipe Industries, alleging violations of the
federal antitrust laws and various state law causes of action. The
district court dismissed plaintiff's antitrust claims on June 10,
1998, and granted summary judgment for defendants on the remaining
state law claims on January 12, 1999. This appeal followed. After
carefully examining the record and the law, we affirm.
 BACKGROUND
 The Serpa Corporation is a distributor of plumbing
supplies. Between 1976 and 1996, Serpa was the exclusive sales
representative in New England for certain plumbing supply products
manufactured by defendant Anaco.
 Anaco manufactures cast iron soil pipes ("CISPs") and
stainless steel no-hub joints known as fittings and couplings.
CISPs, fittings, and couplings are used to transport human waste
from buildings to sewer lines. Because the products are
manufactured in accordance with industry standards, they are
virtually identical across companies. Historically, the products
were sold through exclusive sales representatives, like Serpa, who
sold the products to plumbing supply wholesalers on the basis of
price. In this case, Serpa sold couplings and fittings
manufactured by Anaco and used its position as a regional sales
representative to offer price discounts to wholesalers within
guidelines set by Anaco.
 Serpa's complaint alleges that between November 1995 and
August 1996, defendant McWane acquired both Tyler and Anaco. Prior
to being acquired by McWane, Tyler was a competitor of Anaco's. 
Plaintiff further alleges that the acquisitions of Tyler and Anaco
gave McWane control of more than eighty-five percent (85%) of the
couplings and fittings market in New England.
 After acquiring Anaco, McWane placed the marketing of
Anaco products under the direction of Tyler and subsequently
terminated Serpa as a sales representative for Anaco products. The
November 19, 1996 termination letter stated that Anaco would pay
Serpa a duplicate commission for all orders received and invoiced
for one month, rather than have Serpa serve as a "lame duck" sales
representative for that time.
 Serpa filed this suit on July 7, 1997, alleging that
defendants' consolidation lessened competition and constituted an
attempt to monopolize the New England market for CISPs, fittings,
and couplings in violation of the federal antitrust statutes. 
Serpa also alleged state law causes of action for breach of
contract, interference with advantageous business relations, breach
of the implied covenant of good faith and fair dealing, and
violation of the Massachusetts Consumer Protection Act, M.G.L.A.
c. 93A.
 The district court dismissed plaintiff's antitrust claims
on June 10, 1998, and granted summary judgment for defendants on
the remaining state law claims on January 12, 1999. DISCUSSION
I. Plaintiff's Antitrust Claims
 Plaintiff argues that the district court erred in
dismissing its antitrust claims for lack of standing. We review a
dismissal for failure to state a claim pursuant to Fed. R. Civ. P.
12(b)(6) de novo, accepting all well-pleaded facts as true and
drawing all reasonable inferences in favor of the party dismissed.
See Carreiro v. Rhodes Gill and Co., Ltd., 68 F.3d 1443, 1446 (1st
Cir. 1995); Washington Legal Found. v. Massachusetts Bar Found.,
993 F.2d 962, 971 (1st Cir.1993). We do not, however, accept a
plaintiff's unsupported conclusions or interpretations of law. Id. 
For the reasons stated below, we affirm the ruling of the district
court.
 Plaintiff's complaint alleges that McWane's acquisition
of Anaco and Tyler has had and will have the effect of
substantially lessening competition or tending to create a monopoly
in the New England market for CISPs, fittings, and couplings in
violation of 2 of the Sherman Act, 15 U.S.C. 2, and 7 of the
Clayton Act, 15 U.S.C. 18. Before reaching the merits of the
federal antitrust claim, defendants moved the district court to
dismiss on the grounds that the plaintiff lacks standing under 4
of the Clayton Act. 
 Section 4 of the Clayton Act provides a private cause of
action for violations of the federal antitrust laws. The statute
states:
 Any person who shall be injured in his
 business or property by reason of anything
 forbidden in the antitrust laws may sue
 therefor . . . and shall recover threefold the
 damages by him sustained, and the cost of
 suit, including a reasonable attorney's fee.

15 U.S.C. 15. Despite the broad language of 4, the Supreme
Court has held that 4 of the Clayton Act does not "allow every
person tangentially affected by an antitrust violation to maintain
an action to recover threefold damages for the injury to his
business or property." Blue Shield of Va. v. McCready, 457 U.S.
465, 477 (1982); see also Hawaii v. Standard Oil Co., 405 U.S. 251,
263 (1972) ("Congress did not intend the antitrust laws to provide
a remedy in damages for all injuries that might conceivably be
traced to an antitrust violation."). Instead, the Court has
created a comprehensive antitrust standing doctrine to determine
which persons are entitled to bring suit under the federal
antitrust statutes. See Associated General Contractors of Cal.,
Inc., v. California State Council of Carpenters, 459 U.S. 519,
529-35 (1983); Sullivan v. Tagliabue, 25 F.3d 43, 45 (1st Cir.
1994).
 Standing is restricted in antitrust cases to avoid
overdeterrence. By limiting the availability of private antitrust
actions to certain parties, federal courts "ensure that suits
inapposite to the goals of the antitrust laws are not litigated and
that persons operating in the market do not restrict procompetitive
behavior because of a fear of antitrust liability." Todorov v. DCH
Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir. 1991); see also 
Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d
391, 394 (7th Cir. 1993) ("Given the potential scope of antitrust
violations and the availability of treble damages, an overbroad
reading of 4 could result in 'overdeterrence,' imposing ruinous
costs on antitrust defendants, severely burdening the judicial
system, and possibly chilling economically efficient behavior."). 
The result is that standing in an antitrust case is "not simply a
search for an injury in fact; it involves an analysis of prudential
considerations aimed at preserving the effective enforcement of the
antitrust laws." Todorov, 921 F.2d at 1448 (citing Associated
General, 459 U.S. at 535).
 In Associated General, the Supreme Court set forth six
factors that must be evaluated on a case-by-case basis to determine
whether a plaintiff has standing to bring an antitrust action. See
Sullivan, 25 F.3d at 46 (citing Associated General, 459 U.S. at
537-45). These factors are: (1) the causal connection between the
alleged antitrust violation and harm to the plaintiff; (2) an
improper motive; (3) the nature of the plaintiff's alleged injury
and whether the injury was of a type that Congress sought to
redress with the antitrust laws ("antitrust injury"); (4) the
directness with which the alleged market restraint caused the
asserted injury; (5) the speculative nature of the damages; and (6)
the risk of duplicative recovery or complex apportionment of
damages. See id.
 Although courts must "consider the balance of factors in
each case in an effort to guard against 'engraft[ing] artificial
limitations on the 4 remedy,'" Sullivan, 25 F.3d at 46 (quoting
McCready, 457 U.S. at 472), we can dispose of this case on the
antitrust injury factor since distributors, like Serpa,
presumptively lack antitrust standing. Cf. SAS of Puerto Rico,
Inc. v. Puerto Rico Tel. Co., 48 F.3d 39, 44-45 (1st Cir. 1995).
 The Supreme Court has defined "antitrust injury" as an
"injury of the type the antitrust laws were intended to prevent and
that flows from that which makes defendants' acts unlawful." 
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489
(1977). The harm "should reflect the anticompetitive effect either
of the violation or of anticompetitive acts made possible by the
violation. It should, in short, be 'the type of loss that the
claimed violations . . . would be likely to cause.'" Id. (quoting
Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125
(1969)). Consequently, a proper plaintiff "must prove more than
injury causally linked to an illegal presence in the market." Id.
 Competitors and consumers in the market where trade is
allegedly restrained are presumptively the proper plaintiffs to
allege antitrust injury. See SAS, 48 F.3d at 44-45. ("[T]he
presumptively 'proper' plaintiff is a customer who obtains services
in the threatened market or a competitor who seeks to serve that
market."). In contrast, a commercial intermediary, such as a
distributor or sales representative, generally lacks standing
because its antitrust injury is too remote. See, e.g., G.K.A.
Beverage Corp., 55 F.3d at 767; SAS, 48 F.3d at 44; Fischer v. NWA,
Inc., 883 F.2d 594, 600 (8th Cir. 1989); John Lenore & Co. v.
Olympia Brewing Co., 550 F.2d 495, 500 (9th Cir. 1977); Universal
Brands, Inc. v. Philip Morris, Inc., 546 F.2d 30, 33 (5th Cir.
1977). A leading antitrust treatise explains:
 [C]learly lacking antitrust injury, and thus
 having no standing, is the firm whose injury
 is caused merely by the efficiency effects of
 a vertical merger. For example, once a firm
 has integrated vertically into distribution by
 acquiring one or more existing distributors,
 it may reduce costs by dealing only with its
 wholly-owned distributors. A distributor
 terminated for this reason might certainly
 suffer injury-in-fact, but it would not suffer
 antitrust injury as long as there were
 alternative sources of the product.

Areeda & Hovenkamp, Antitrust Law 381'c, at 114 (Supp. 1999).
 Fischer is indicative of the case law concerning
antitrust injury. In Fischer, former stockholders of a regional
airline, Fischer Bros. Aviation, filed an antitrust suit against
Northwest Airlines. The complaint stated that on December 23, 1995
Northwest and Fischer signed an exclusive regional airline service
agreement for all flights originating in Detroit. On January 23,
1986, one month after the Northwest/Fischer agreement was signed,
Northwest announced that it was acquiring Republic Airlines. At
that time, Republic had an ongoing, exclusive service contract for
the Detroit market with Simmons Airlines. Unlike the
Northwest/Fischer agreement, however, the Republic/Simmons
agreement had no subsidization arrangement and was not terminable
at will with six months notice.
 On August 12, 1986, the Department of Transportation
approved Northwest's acquisition of Republic. Although the
acquisition created a conflict between the Fischer and Simmons
regional service agreements, Northwest believed that a compromise
could be reached, accommodating the contractual rights of both
regional carriers and permitting them to share the Detroit market. 
However, all attempts to resolve the Fischer/Simmons conflict
failed, and Northwest was forced to terminate the Fischer contract.
 Fischer subsequently filed suit in federal court,
asserting antitrust claims against both Northwest and Simmons. 
Defendants moved for summary judgment, and the district court
granted the motion. The Eighth Circuit concluded that Fischer had
not suffered antitrust injury and therefore lacked antitrust
standing. The court reasoned:
 Our review of the record convinces us that
 Fischer failed to prove that it has suffered
 an antitrust injury. Fischer does not contend
 that it was a customer of Northwest forced to
 pay increased prices. Nor was Fischer a
 competitor injured by Northwest's acquisition
 of monopoly power (roughly 75% of the Detroit
 market). Rather, Fischer asserts that it
 suffered damage when it was terminated as
 Northwest's exclusive regional carrier in
 Detroit. We conclude that Fischer's
 termination was not caused by anticompetitive
 conduct or an anticompetitive effect of such
 conduct; rather, it was caused by Northwest's
 need to avoid employing two regional airlines
 where only one was required. We are convinced
 that even in a city in which Northwest had far
 less than monopoly power, it would have been
 reluctant to waste resources on overlapping
 contractual agreements providing twice the
 regional connecting flight service required.

Fischer, 883 F.2d at 600.
 Olympia Brewing Co. is also illustrative. The defendant,
Olympia, acquired Hamm's Brewing Co. and terminated Hamm's
distributors, including the plaintiff, John Lenore & Co. Lenore
sued Olympia, alleging that the acquisition violated 7 of the
Clayton Act because it substantially lessened competition. The
district court granted summary judgment in favor of Olympia, and
the Ninth Circuit affirmed.
 Citing Brunswick, the Ninth Circuit held that Lenore did
not have standing to sue because it had not suffered antitrust
injury. See Olympia Brewing Co., 550 F.2d at 500. The court
reasoned that the acquisition of Hamm's violated the antitrust
laws, if at all, because competition was reduced in the manufacture
of beer, a market in which Lenore was neither a competitor nor a
consumer.
 Even though Lenore's injury may have ". . .
 occurred 'by reason of' the unlawful
 acquisitions, it did not occur 'by reason of'
 that which made the acquisition unlawful." 
 The terminations were an incidental matter
 which the merger may have made possible, but
 certainly did not cause. All Lenore really
 alleges is that because Olympia purchased the
 Hamm's brand, Lenore was replaced in favor of
 other distributors. This is insufficient to
 make out a case under 7 which is concerned
 with competition, not competitors.

Id. (internal citations omitted).
 Here, Serpa does not bring its claim as either a
competitor or a consumer but as a distributor whose injuries
resulted from the loss of its position as Anaco's exclusive sales
representative in the New England market. This loss is neither
connected with, nor resulted from, defendant's market power in the
CISPs, fittings, and couplings industry. Therefore, plaintiff's
injuries do not flow "from that which makes the defendants' acts
unlawful." Brunswick, 429 U.S. at 489. Because Serpa's injuries
flow from the termination of its distributorship, and not from any
anticompetitive effects of defendants' acquisition of Anaco, we
find that Serpa has not suffered an antitrust injury. See G.K.A.
Beverage Corp., 55 F.3d at 767; SAS, 48 F.3d at 44; Fischer, 883
F.2d at 600; Olympia Brewing Co., 550 F.2d at 500.
 In reaching this conclusion, we recognize that there may
be some instances where presumptively disfavored plaintiffs do have
standing to bring an antitrust action. See SAS, 48 F.3d at 45. In
SAS, this court stated that although competitors and consumers are
presumptively favored, "'presumptively' does not mean always; there
can be exceptions, for good cause shown." Id. Here, Serpa alleges
that it is the "only truly viable plaintiff" because (1) "there is
no real competitor on the manufacturing level," and (2) plumbing
wholesalers, contractors, and home buyers have no incentive to file
an antitrust suit because monopoly pricing in this market increases
the costs to individual consumers by a relatively small margin. 
This Court has stated that the "most obvious reason for conferring
standing on a second-best plaintiff is that, in some general
category of cases, there may be no first best with the incentive to
sue." Id. (citing Associated General, 459 U.S. at 542). In this
case, however, we are satisfied that at least some consumers, as
well as defendants' competitors, have ample incentive to bring an
antitrust claim. 
 The complaint alleges:
 Shortly after the termination of Serpa as the
 representative for Anaco Couplings and
 Fittings, Anaco began to increase its prices
 for Couplings by announcing a wholesale list
 price increase of approximately seven percent
 (7%) and reducing the amount of discounts
 commonly provided to wholesalers.

A seven-plus percent increase in the cost of major plumbing
components is not de minimus. Although the individual home buyer
may be hindered by imperfect information, there is ample reason to
believe that large contractors and commercial entities involved in
the construction of "multi-unit residential and commercial
buildings" have the necessary information, incentive, and resources
to resist monopoly pricing by defendants.
 As for defendants' competitors, the complaint indicates
that they account for approximately fifteen percent (15%) of the
New England market. We need look no further to rebut plaintiff's
assertion that "there is no real competitor on the manufacturing
level." The complaint, however, contains two additional
allegations that we believe are significant. First, the complaint
states that in 1992 Anaco instituted an antitrust action in federal
court against Tyler for engaging in predatory pricing. Second, the
complaint alleges that defendants have acted in concert to
"eliminate competition in the sale of Couplings and Fittings in the
New England market." Although competitors are not necessarily
injured by monopoly pricing, they are clearly injured by an abuse
of monopoly power such as predatory pricing. Where, as here, the
complaint alleges that defendants have an intent to eliminate
competition in the New England market and have been sued for
engaging in anticompetitive conduct in the recent past, there is
every reason to believe that defendants' competitors have ample
incentive to bring an antitrust claim. Accordingly, there is no
reason to extend antitrust standing to Serpa, a distributor
incidentally connected to the alleged antitrust violation in this
case.
 Finally, plaintiff's reliance on Blue Shield of Va. v.
McCready, 457 U.S. 465 (1982), is misplaced. In McCready, the
court held that a consumer of health services could sue under the
antitrust laws to redress an alleged conspiracy between her
insurance plan and Virginia psychiatrists. The terms of the plan
precluded participants from receiving reimbursements for treatment
given by psychologists. Although McCready was not the immediate
target of the alleged boycott, she was a plan beneficiary who had
used a psychologist and had been denied reimbursement. The Supreme
Court granted McCready standing, stating that her injury "was
inextricably intertwined with the injury the conspirators sought to
inflict on psychologists and the psychotherapy market." Id. at
484. The Court further stated that McCready was the "necessary
step in effecting the ends of the alleged illegal conspiracy." Id.
at 479.
 Serpa urges the Court to apply the "inextricably
intertwined" language of McCready to this case. We decline. 
First, this Court has already stated that "[i]t is doubtful that
this language -- if taken as a physical image -- was ever intended
as a legal test of standing." SAS, 48 F.3d at 46. Second, while
standing in McCready was conferred to a plaintiff who was only
derivatively injured, the plaintiff was a consumer in the market
directly affected by the antitrust violation. Accordingly,
subsequent Supreme Court jurisprudence has interpreted the McCready
language as a legal conclusion; i.e., applying the "inextricably
intertwined" standard to consumers and competitors. See Atlantic
Richfield v. USA Petroleum Co., 495 U.S. 328, 345 (1990);
Associated General, 459 U.S. at 539; SAS, 48 F.3d at 46. Moreover,
even if we thought "inextricably intertwined" was a proper test for
standing, the facts do not support its application in this case. 
Specifically, Serpa's marginal pricing discretion belies
plaintiff's assertion that defendants necessarily had to terminate
Serpa to eliminate competition in the New England plumbing supply
market. Therefore, under the circumstances of this case, we
decline to interpret McCready broadly, believing that such an
approach would needlessly expand the limits of antitrust standing
currently in place in this Circuit.
II. Plaintiff's State Law Causes of Action
 Following the district court's dismissal of the antitrust
claims, the parties commenced discovery on plaintiff's remaining
state law claims. The complaint alleged (1) breach of contract;
(2) interference with advantageous business relations; (3) breach
of the implied covenant of good faith and fair dealing; and (4)
violation of the Massachusetts Consumer Protection Act, M.G.L.A.
c. 93A. At the conclusion of the scheduled discovery period,
defendants moved for summary judgment on these remaining counts,
and the district court granted the motion on January 12, 1999. A. Breach of Contract
 Anaco informed Serpa of its intent to terminate Serpa as
its exclusive sales representative by letter dated November 19,
1996. The letter indicated that Serpa's termination was effective
immediately, but stated that Anaco would pay Serpa a duplicate
commission for all orders received and invoiced for one month,
rather than have Serpa serve as a "lame duck" sales representative
for that time.
 Under Massachusetts law, a contract without a durational
term is terminable at will by either party upon reasonable notice. 
See Teitelbaum v. Hallmark Cards Inc., 520 N.E.2d 1333, 1336 (Mass.
App. Ct. 1988). Plaintiff argues that whether Anaco provided
reasonable notice of termination is a question of fact, and
therefore summary judgment was inappropriate. We disagree.
 In Teitelbaum, the court determined that a breach of
contract claim for inadequate notice of termination may be disposed
of by motion for summary judgment. See id. at 1336. In reaching
this conclusion, the court stated that reasonableness of notice "is
measured in terms of the ability of the party affected by the
termination to obtain a substitute arrangement." Id.
 If that party is able to obtain another
 supplier before the performance of the party
 effecting termination becomes due, then it
 necessarily follows that the terminating party
 has furnished reasonable notice and will not
 be responsible for damages. Put another way,
 the adequacy of the notice is generally
 coextensive with the amount of harm that can
 be proved by the party who has incurred the
 loss of a supplier.

Id. Here, there is no evidence in the record that Serpa's injuries
resulted from inadequate notice of termination. Serpa merely
states that following its termination by Anaco it was deprived of
its commissions on Anaco products. This is an inevitable loss and
does not arise from the manner in which the contract was
terminated.
 Plaintiff's reliance on Cherick Distributors, Inc. v.
Polar Corporation, 669 N.E.2d 218 (Mass. App. Ct. 1996), is
misplaced. In Cherick, the plaintiff's exclusive distributorship
agreement was terminated by defendant on four days notice in
retaliation for a letter plaintiff sent to other distributors
urging the distributors to collectively negotiate with the
defendant. The court determined that "[w]hether the four-day
termination notice constituted reasonable notice under commercial
standards of good faith and fair dealing was a question properly
put to the jury in this case." Id. at 220. The court reasoned:
 The evidence indicated that the four-day
 notice left Cherick with no time to secure
 another supplier, make adjustments in its
 equipment and warehouse, and maintain its
 staff. Accordingly, there was adequate
 support for the jury's finding that four days'
 notice was unreasonable and that it
 constituted a breach of the covenant of good
 faith and fair dealing.

Id. Here, in contrast, plaintiff did not present any evidence that
a month was insufficient time to secure another supplier, to make
adjustments to its operations, or that it provided Serpa with an
inadequate opportunity to maintain its staff. Accordingly, Cherick
does not require reversal of the district court's ruling.
 B. Implied Covenant of Good Faith and Fair Dealing
 Plaintiff argues that its abrupt termination constitutes
a breach of the implied covenant of good faith and fair dealing
that is implicit in every contract. See Anthony's Pier Four, Inc.
v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991) ("Every contract
implies good faith and fair dealing between the parties to it."). 
Plaintiff's argument is unavailing. The notice of termination was
reasonable and there is nothing per se unreasonable about
terminating an exclusive distributorship contract.
 Plaintiff's reliance on Cherick is once again misplaced. 
The Cherick plaintiff was terminated by defendant on four days
notice, in retaliation for its suggestion to similarly situated
distributors that they band together and collectively bargain with
the defendant manufacturer. In this case, there is no evidence
that Anaco's termination of Serpa had a retaliatory motive, was
undertaken in bad faith, or otherwise violated public policy. 
Additionally, Serpa was paid commissions for a period of thirty
days following its termination. Under these circumstances, we find
that Serpa cannot show a breach of the implied covenant of good
faith and fair dealing.
 C. Intentional Interference With Advantageous Business
 Relationship

 Under Massachusetts law, to state a cause of action for
intentional interference with an advantageous business
relationship, plaintiff "must plead and prove that the defendants
(1) engaged in intentional and willful acts (2) calculated to cause
damage to the plaintiffs' lawful business (3) with an unlawful
purpose and without right or justification, (4) thereby causing
actual damage or loss." Doyle v. Hasbro, Inc., 884 F. Supp. 35, 40
(D. Mass. 1995); Chemawa Country Golf, Inc. v. Wnuk, 402 N.E.2d
1069, 1072 (Mass. App. Ct. 1980).
 In this case, Serpa argues that "defendants acted in
stealthy haste to terminate Serpa's contract to prevent it from
acquiring competing product lines to sell to its former Anaco
customers." As with its other contractual claims, Serpa relies on
Cherick in support of its argument. Again, however, we find that
Cherick is inapposite. In Cherick, the court held "[t]he jury
could have found that the abrupt termination of Cherick's
distributorship agreement, coinciding as it did with the planned
meeting of Polar distributors, was calculated to put Cherick out of
business and thereby discourage other distributors from meeting." 
669 N.E.2d at 220. Here, in contrast, defendants made a legitimate
business decision based on obvious efficiency concerns to eliminate
one of two overlapping distributors. There is no evidence in the
record of an unlawful or improper motive, and nothing in the record
indicates that defendants' conduct was calculated to injure Serpa. 
Further, there is no evidence that a month is insufficient notice
of termination. Accordingly, we find that summary judgment on this
claim was proper.
 D. Massachusetts General Laws ("Chapter 93A")
 For conduct to violate Chapter 93(A) it must (1) fall
within "the penumbra of some common-law, statutory, or other
established concept of unfairness"; (2) be "immoral, unethical,
oppressive, or unscrupulous"; and (3) "cause[] substantial injury
to [other businessman]." Linkage Corp. v. Trustees of Boston
Univ., 679 N.E.2d 191, 209 (Mass. 1997) (quoting PMP Assocs., Inc.
v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). Here,
Serpa relies on the "same facts underlying its federal antitrust
claims to support its Massachusetts statutory claim."
 Having carefully reviewed the record, we conclude there
is no evidence of "immoral, unethical, oppressive, or unscrupulous"
conduct sufficient to state a Chapter 93A claim. See Bradley v.
Dean Witter Realty, Inc., 967 F. Supp. 19, 29 (D. Mass. 1997). As
a matter of law, "a refusal to deal, without a showing of
monopolistic purpose or concerted effort to hinder free trade, is
not an unfair trade practice under G.L.C. 93A, and is therefore not
actionable." PMP Assocs., 321 N.E.2d at 919. Accordingly, summary
judgment on this claim was proper.
 CONCLUSION
 For the reasons stated above, we affirm the judgment of
the district court.