# United States Court of Appeals
## For the First Circuit

Nos. 19-1463, 19-1484

PRIMARQUE PRODUCTS CO., INC.,

Plaintiff, Appellant / Cross-Appellee,

v.

WILLIAMS WEST & WITTS PRODUCTS COMPANY
d/b/a INTEGRATIVE FLAVORS,

Defendant, Appellee / Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Thompson and Barron,
Circuit Judges.[*]

 Andrew Lawlor, with whom Fedele and Murray, P.C. was on brief, for Appellant/Cross-Appellee.
 Rodney L. Lewis, with whom Polsinelli, P.C. was on brief, for Appellee/Cross-Appellant.

---

[*] Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

February 12, 2021

**BARRON, Circuit Judge.** The appeal and cross-appeal at issue here stem from litigation in the District of Massachusetts that followed the termination, without advance notice, of a thirty-nine-year business relationship between a company that manufactured and supplied soup base products and a company that distributed them. Following a five-day trial, the jury awarded the distributor $255,000 in total damages for its Massachusetts-law breach of contract and tortious interference with business relations claims against the manufacturer, although the District Court denied the distributor's motion for prejudgment interest on those damages. The District Court also granted summary judgment to the manufacturer on the distributor's claim against it under Chapter 93A of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A"), and to the manufacturer on its counterclaim for breach of contract under Massachusetts law, for which the District Court awarded the manufacturer $97,843.22 in damages, plus prejudgment interest. The distributor now appeals from various of the District Court's pre- and post-verdict rulings, while the manufacturer cross-appeals. We reverse in part and vacate in part in the distributor's appeal, and we affirm in the manufacturer's cross-appeal.

**I.**

**A.**

The following facts, which were supportably found by the District Court both at summary judgment and in its rulings on certain post-trial motions, are undisputed on appeal. Primarque Products Co. ("Primarque"), the appellant, is a Massachusetts-based distributor of food products, including soup base products. Williams West & Witts Products Co. d/b/a Integrative Flavors ("WWW"), the cross-appellant, is an Indiana-based manufacturer and supplier of soup base products that is incorporated in Illinois. Primarque and WWW have conducted business with each another since 1976.

Primarque and WWW briefly entered into written distribution agreements in, respectively, 1987 and 1990, but, by 1993, each of those agreements had terminated. After the period in which those agreements were in effect, however, the parties continued to do a large amount of business with each other.

Their repeated transactions during this period involved Primarque as a distributor sending a purchase order to WWW detailing the desired soup base type, quantity, cost, method of shipping, and delivery location; WWW as a manufacturer and supplier filling the order and invoicing Primarque; Primarque paying WWW for what it had been invoiced; and Primarque reselling the products that it purchased from WWW to a variety of retail customers. The

parties' transactions during this period also involved what the parties referred to as the "Drop Ship Arrangement," pursuant to which WWW shipped soup base products directly to certain retail customers known as the "Drop Ship Customers" that had purchased soup base products through Primarque.

The Drop Ship Arrangement relieved Primarque, as a distributor, of the hassle of receiving, storing, and re-shipping the soup base products; and this practice, in turn, made Primarque's pricing for those products more competitive with its retail customers. WWW, however, did not during this period directly solicit business from Drop Ship Customers. Moreover, if those customers made inquiries with WWW about directly purchasing its soup base products, WWW referred them to Primarque. Primarque, for its part, did not solicit business from customers buying soup base products from WWW directly.

Primarque did sell other suppliers' soup base products to certain of its retail customers, but it still was WWW's largest purchaser of those products. WWW, in turn, was Primarque's largest supplier of them. As an indication of the scale of the business that the two parties did with each other, in 2014, Primarque

purchased approximately $1,313,175.59 worth of soup base products from WWW.[1]

The events that precipitated the dispute that gives rise to these appeals began in May of 2014, when Primarque, without notifying WWW, started meeting with competitors of WWW about their supplying Primarque with "replacement" soup base products for Primarque to sell to its retail customers. Primarque signed memoranda of understanding with two of those competitors, Major Foods and Eatem. As Major Foods and Eatem developed replacement products for Primarque to distribute, Primarque began relying on them to supply it with some of the soup base products that it had previously relied on WWW to supply.

On March 9, 2015, WWW reviewed its sales numbers and identified certain downward trends related to its business with Primarque. The next day, WWW sent an e-mail to Jack Barron, Primarque's owner and president, in which it inquired whether Primarque's business was down generally or whether it was transitioning some of its business away from WWW. Barron replied: "[a] combination of both."

Two days later, on March 12, 2015, WWW notified Primarque that it would no longer be selling its products to Primarque,

---

[1] This was about a $60,000 increase from calendar year 2013, when Primarque purchased $1,254,674.56 worth of soup base products from WWW.

effective that day.  On the same day, WWW informed the Drop Ship Customers that Primarque was no longer distributing WWW products and that these customers could now obtain soup base products directly from WWW at lower prices.  WWW thereafter began selling soup base products directly to some of the Drop Ship Customers.

**B.**

In response to WWW's actions, Primarque filed suit in Massachusetts state court on March 19, 2015.  WWW then removed the case to the United States District Court for the District of Massachusetts based on diversity jurisdiction.

Primarque's complaint asserted four claims against WWW under Massachusetts law:  breach of contract (Count I), promissory estoppel (Count II), tortious interference with business relations (Count III), and a violation of Chapter 93A (Count IV).  Primarque sought damages based on lost profits from sales that it alleged that it would have made to the Drop Ship Customers in the absence of WWW's abrupt termination of their relationship, including sales that Primarque alleged that it would have made to those customers after the filing of the complaint.

WWW in turn filed a counterclaim under Massachusetts law for breach of contract.  WWW based this claim for breach of contract on Primarque's conceded withholding of payment on a final shipment of $97,843.22 worth of goods that it had received from

WWW, for which WWW sought the unpaid amount plus prejudgment interest.

## C.

Following discovery, WWW moved for summary judgment in its favor as to both Primarque's claims against it and its counterclaim. On March 29, 2018, the District Court ruled that (1) WWW was entitled to summary judgment on its counterclaim for breach of contract and that it was entitled to $97,843.22 in damages plus prejudgment interest; (2) WWW was entitled to summary judgment on Primarque's Chapter 93A claim because there was not "a scintilla of evidence that WWW engaged in any unfair[] or deceptive act or practice"; and (3) WWW was also entitled to summary judgment on Primarque's promissory estoppel claim and as to substantial aspects of Primarque's breach of contract and tortious interference with business relations claims. See Primarque Prods. Co. v. Williams W. & Witts Prods. Co., 303 F. Supp. 3d 188, 191 & n.1, 205-07, 209 (D. Mass. 2018). But, as to those lattermost claims, the District Court stated that, even absent a written agreement, "Massachusetts law would still require WWW to provide Primarque with reasonable notice of its intent to terminate the parties' distributorship arrangement," id. at 205, and it further determined that "there is a question of fact as to whether WWW improperly terminated the parties' relationship without reasonable notice," id. at 208.

- 8 -

The case went to trial later that year. The District Court instructed the jury that before it could find in Primarque's favor on the issue of whether WWW had provided it with reasonable notice of termination, the jury would first have to determine "whether Primarque and WWW had a contract for the sale of soup base" "under which . . . WWW would prove periodic shipments of goods to" Primarque -- a determination which the jury could make in view of the "conduct [of] both parties." On June 1, 2018, the jury unanimously found by special verdict that WWW and Primarque did "have a contract for the continuing purchase and sale of soup base" and that "WWW, without excuse, breach[ed] its contract with Primarque by failing to provide reasonable notice of its termination of that contract." The jury also found that "WWW intentionally and improperly interfere[d] with Primarque's advantageous business relations with its drop ship customers" and that this interference "induce[d] such customers to stop doing business with Primarque." The jury determined that Primarque was entitled to damages amounting to $51,000 on the breach of contract claim and $204,000 on the tortious interference with business relations claim. See Primarque Prods. Co. v. Williams W. & Witts Prod. Co., 368 F. Supp. 3d 192, 195 (D. Mass. 2019).

WWW thereafter moved under Fed. R. Civ. P. 50(b) for the District Court to set aside the jury's verdict on Primarque's breach of contract and tortious interference with business

relations claims, having earlier moved at the close of Primarque's case-in-chief under Fed. R. Civ. P. 50(a) for the District Court to grant WWW judgment as a matter of law on those two claims. The District Court denied the motions but granted a separate request by WWW under Fed. R. Civ. P. 59(e) to reduce the jury's award of damages to Primarque on those claims by $51,000, as the District Court agreed with WWW that the jury's $51,000 damages award on Primarque's breach of contract claim was duplicative of its $204,000 damages award on Primarque's tortious interference with business relations claim. Id. at 198-99. The District Court also entered judgment in favor of WWW on its counterclaim for breach of contract, awarding WWW $97,843.22 in damages plus prejudgment interest on that claim. Id. at 196 n.3, 202.

The District Court next addressed a request by Primarque to "offset" the damages awarded to WWW on its counterclaim from the damages that had been awarded to Primarque on its claims against WWW. Id. at 199-200. In rejecting that request, the District Court first determined that Primarque's $204,000 damages award on its tortious interference with business relations claim did not qualify for prejudgment interest and then denied Primarque's offset request as "a blatant attempt to avoid paying" the prejudgment interest that Primarque owed WWW on the counterclaim. Id. at 200.

Primarque appealed, contending that the District Court erred in (1) finding that the jury's damages award on Primarque's breach of contract claim against WWW was duplicative of its damages award on Primarque's tortious interference with business relations claim against WWW; (2) failing to award Primarque prejudgment interest for the damages on its tortious interference with business relations claim and, relatedly, rejecting its offset request; and (3) granting summary judgment to WWW on Primarque's Chapter 93A claim. WWW cross-appealed, contending that the District Court erred by (1) denying its motion for judgment as a matter of law as to Primarque's breach of contract claim; (2) denying its motion for judgment as a matter of law as to Primarque's tortious interference with business relations claim; and (3) denying its request for alternative relief under Fed. R. Civ. P. 59(e) to reduce Primarque's total damages award for those claims to, at most, $39,017, on the ground that any larger award of damages would be unduly speculative.

## II.

Massachusetts law applies to the tort and contract-law issues in this case. See Performance Trans., Inc. v. Gen. Star Indem. Co., 983 F.3d 20, 24 (1st Cir. 2020) (citing Dukes Bridge LLC v. Beinhocker, 856 F.3d 186, 189 (1st Cir. 2017)). Our review of the District Court's rulings on the motions for summary judgment and judgment as a matter of law is de novo. See Zabala-De Jesus

- 11 -

v. Sanofi-Aventis P.R., Inc., 959 F.3d 423, 427 (1st Cir. 2020); Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991). We review "grants and denials of Rule 59(e) motions . . . only for abuse of discretion," Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005) (citing Venegas-Hernandez v. Sonolux Recs., 370 F.3d 183, 190 (1st Cir. 2004)), but, in the course of that review, we review issues of law de novo, see Crowe v. Bolduc, 365 F.3d 86, 90 (1st Cir. 2004).

## III.

We begin with WWW's cross-appeal, because it concerns, among other things, a threshold question: whether there was a sufficient basis for a reasonable juror to find that there was a contract between the parties that contained a requirement to provide reasonable notice of termination of the contract. Specifically, WWW claims that the District Court erred in denying its motion for judgment as a matter of law on Primarque's breach of contract claim because, in its view, "[t]he undisputed evidence prove[d] there was no binding distribution agreement between the parties." We thus start with that challenge before turning to the others that WWW brings in its cross-appeal.

## A.

As we noted at the outset, the District Court granted WWW summary judgment on Primarque's breach of contract claim to the extent that this claim rested on a theory that the parties had

an express contractual agreement.  In doing so, the District Court observed that it was undisputed that the parties "did not have a written agreement" for the distribution and supply of soup base products, Primarque, 303 F. Supp. 3d at 205, and the District Court also determined in ruling on WWW's motion for summary judgment on that claim that, as a matter of law, there also was no enforceable oral agreement in place between them, id. at 205-06.[2]

As we also noted at the outset, however, the District Court did not understand itself to have granted WWW summary judgment on Primarque's breach of contract claim in full.  Indeed,

_____

[2] As the District Court explained,

> Primarque allege[d] that the parties had an oral non-solicitation agreement whereby WWW would indefinitely refrain from doing business directly with Primarque's customers. . . . However, . . . the terms of the alleged non-solicitation agreement are not clear:  did WWW agree to only refrain from dealing with Drop Ship Customers, and if so, was it only Drop Ship Customers as to who WWW was Primarque's only soup base supplier?
> . . . .
> Primarque [also] contend[ed] that WWW orally promised to give 90 days' notice of its intent to end the parties' distributorship arrangement. . . . However, . . . Primarque itself cannot define the terms of the agreement.  At times, the terms suggest that notice was required only if WWW were sold or closing.  At other times, Primarque suggests that the notice was required if WWW intended to stop supplying product to it.

Primarque, 303 F. Supp. 3d at 205-06.

in the course of denying WWW's post-trial motion for judgment as a matter of law, the District Court expanded on its summary judgment rationale, explaining that, "[i]n ruling on WWW's motion for summary judgment, I found that [while] there was no binding written or oral agreement between the parties . . . the parties' relationship was [still] governed by Mass. Gen. L[aws] ch. 106, § 2-309," a provision of the Massachusetts Uniform Commercial Code ("Massachusetts UCC") under which "a contract which is terminable at the will of either party requires reasonable termination notice." Primarque, 368 F. Supp. 3d at 197 (quoting Cherick Distribs., Inc. v. Polar Corp., 669 N.E.2d 219, 220 (Mass. App. Ct. 1996)); see also Mass. Gen. Laws ch. 106, § 2-309(3) (hereinafter "Mass. UCC § 2-309(3)").[3]  Thus, the District Court explained, it had allowed the breach of contract claim to go the jury to the extent that claim was predicated on a theory that WWW had breached the reasonable notice term imputed by Mass. UCC § 2-309(3). See Primarque, 303 F. Supp. 3d at 205-06; Primarque, 368 F. Supp. 3d at 197.

---

[3] The text of this statute provides:  "Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." Mass. Gen. Laws ch. 106, § 2-309(3).  The parties do not dispute that the Massachusetts UCC is applicable as a general matter given that the parties' business arrangement was one "relating to the present or future sale of goods," namely, soup base products. Mass. Gen. Laws ch. 106, § 2-106(1).

After Primarque presented its case-in-chief, but before the jury rendered its verdict, WWW moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) as to the portion of Primarque's breach of contract claim that the District Court understood itself to have held survived WWW's summary judgment motion on it. The District Court reserved ruling on that Rule 50(a) motion pending the jury's verdict. The jury then determined that WWW was liable on that breach of contract claim -- finding, by special verdict, that Primarque and WWW "ha[d] a contract for the continuing purchase and sale of soup base" and that "WWW, without excuse, breach[ed] its contract with Primarque by failing to provide reasonable notice of its termination of that contract" -- and awarded damages on that claim to Primarque of $51,000. At that point, WWW renewed its motion for judgment as a matter of law on that claim under Fed. R. Civ. P. 50(b).

WWW contends on cross-appeal that the District Court erred in denying its post-trial motion for judgment as a matter of law. In conducting our de novo review of the District Court's denial of that motion, we must consider whether "'the evidence could lead a reasonable person to only one conclusion,' namely, that the moving party was entitled to judgment." Hendricks, 923 F.2d at 214 (citations omitted) (quoting Conway v. Electro Switch Corp., 825 F.2d 593, 598 (1st Cir. 1987)). We conclude that the District Court did not err in denying the motion.

- 15 -

**1.**

In arguing that the District Court did err, WWW contends as a threshold matter that the parties' course of dealing -- including what WWW calls their repeated transactions by means of "[s]uccessive and consistent purchase orders and invoices" -- cannot on its own suffice to support the jury's finding that the parties had a contract for the continuing purchase and sale of soup base products, let alone that the parties had one imposing a reasonable notice of termination requirement.[4]  In pressing this contention, WWW does not dispute that, as the District Court concluded, Massachusetts law -- specifically, Mass. UCC § 2-309(3) -- makes clear that a reasonable notice of termination requirement may be imputed as a term into a contract for the distribution of goods even if the contract does not expressly include one, at least so long as the parties do not expressly agree to dispense with that imputed term.  See Primarque, 368 F. Supp. 3d at 197; see also Mass. UCC § 2-309(3).  Instead, WWW contends that the statute which provides the legal basis for imputing such a term into an

---

[4] Although Primarque suggests that WWW waived this argument -- a version of which was made by WWW at summary judgment, in its motion for judgment as a matter of law under Fed. R. Civ. P. 50(a), and in its renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) -- by not adequately objecting to a particular jury instruction, we do not need to pause to address that contention because WWW's argument, in any event, "is wrong on the merits."  United States v. Leavitt, 925 F.2d 516, 517 (1st Cir. 1991).

otherwise silent distribution agreement -- Mass. UCC § 2-309(3) -- "is simply inapplicable" here, because "there was no legally-binding distribution agreement between the parties."

WWW is right that Mass. UCC § 2-309(3), by its text, presupposes the existence "of a contract" before imputing a "reasonable notification" term. Id. (emphasis added). WWW identifies no authority, however, to support the conclusion that a distribution "contract" under this provision cannot be an implied-in-fact one under Massachusetts law.[5] And, indeed, the Massachusetts UCC defines a "contract" as "the total legal obligation that results from the parties' agreement," Mass. Gen. Laws ch. 106, § 1-201(12), and further defines "agreement" as "the

_____

[5] "[T]he law of contracts in most, if not all, jurisdictions long has employed a process by which agreements . . . may be 'implied.'" Jago v. Van Curen, 454 U.S. 14, 18 (1981) (quoting Perry v. Sindermann, 408 U.S. 593, 601-02 (1972)). Massachusetts follows the majority rule in this regard. See, e.g., LiDonni, Inc. v. Hart, 246 N.E.2d 446, 449 (Mass. 1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties."); Popponesset Beach Ass'n v. Marchillo, 658 N.E.2d 983, 987 (Mass. App. Ct. 1996) ("An implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract." (citing Restatement (Second) of Contracts § 4 cmt. a, illus. 1-2 (1981)); see also Gen. GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306, 309 (1st Cir. 1990) (applying Massachusetts law) (reversing grant of summary judgment on breach of contract claim where "[t]here [wa]s sufficient evidence on the record to show that an implied contract may have been developed through the parties' course of dealing").

- 17 -

bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance [or] course of dealing," id. § 1-201(3) (emphasis added); see also Restatement (Second) of Contracts § 4 cmt. a (1981) (reflecting that this definition of "agreement" is the means by which the Uniform Commercial Code recognizes implied-in-fact contracts). Similarly, the Massachusetts UCC states that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mass. Gen. Laws ch. 106, § 2-204(1) (emphasis added); see also id. § 2-204, Official Comment (noting Massachusetts UCC's "basic policy of recognizing any manner of expression of agreement, oral, written or otherwise" (emphasis added)).

Nor are we persuaded by WWW's contention that Gettens Electric Supply Co. v. W.R.C. Properties, Inc., 489 N.E.2d 217 (Mass. App. Ct. 1986), requires that we conclude that the District Court erred in determining that Mass. UCC § 2-309(3) could apply here, even though the only evidence of there being a contract at all was the evidence of the parties' course of dealing. That case interpreted the statutory term "written contract" in a different, non-UCC provision. Mass. Gen. Laws ch. 254, § 4 (emphasis added); see Gettens, 489 N.E. 2d at 219 ("The written contract referred to in th[is] portion of § 4 . . . seem[s] to us to refer to a written

contract . . . ."). It thus has no bearing on whether Mass. UCC § 2-309(3)'s unqualified reference to a "contract" encompasses implied-in-fact contracts.[6]

## 2.

WWW also argues that the District Court's pre-trial rulings effectively precluded the jury from concluding, as it did, that the parties had a contract within the meaning of Mass. UCC § 2-309(3). WWW contends that, for this reason as well, the District Court erred in declining to grant its motion for judgment as a matter of law on Primarque's breach of contract claim. But, again reviewing de novo, see Hendricks, 923 F.2d at 214, we find no error.

WWW points to the District Court's determination in rejecting WWW's motion for summary judgment on Primarque's breach of contract claim that there was no enforceable written or oral agreement between the parties. See Primarque, 368 F. Supp. 3d at 196. It further points to the District Court's decision to grant

---

[6] Other cases invoked by WWW do not call this reading of § 2-309(3) into question; indeed, they tend to support it. See Teitelbaum v. Hallmark Cards Inc., 520 N.E.2d 1333, 1336 (Mass. App. Ct. 1988) (holding that the performance of an oral agreement would be "governed essentially by the [reasonable notice] provisions of [Mass. UCC] § 2-309," without suggesting that a different result would obtain for an implied-in-fact agreement); RGJ Assocs., Inc. v. Stainsafe, Inc., 300 F. Supp. 2d 250, 251 (D. Mass. 2004) (applying Massachusetts law) (holding that claim for breach of an "unwritten requirements contract" was "governed by section 2-309").

- 19 -

a motion in limine in favor of WWW, which had requested that the District Court bar Primarque from "mention[ing], refer[ing] to . . . or attempt[ing] to convey to the jury in any manner regarding any alleged written or oral agreement between Primarque and WWW" (emphasis altered).  WWW contends that these rulings "confirmed there was no agreement between the parties . . . oral, written or otherwise," (emphasis added).  WWW thus argues that these rulings require the conclusion that no reasonable juror could have found in Primarque's favor on the breach of contract claim.

It is true that, in ruling on WWW's summary judgment motion, the District Court determined that there was no written or oral agreement between the parties.  See Primarque, 368 F. Supp. 3d at 196.  But, it did not purport in doing so to preclude Primarque from presenting course-of-dealing evidence of the sort that would allow the jury to conclude that the parties had an implied-in-fact contract within the meaning of Mass. UCC § 2-309(3).  Nor did it purport to do so in granting the motion in limine.  Indeed, the District Court's jury instructions expressly provided that the jury could "infer[]" the existence of a distribution contract "from the conduct of the parties."  Thus, there is no merit to this aspect of WWW's challenge.

### 3.

Next, WWW contends that the District Court erred in denying its motion for judgment as a matter of law on Primarque's

breach of contract claim because the evidence before the jury "squarely contradict[ed]" the parties having had an implied-in-fact distribution contract based on their course of dealing. But, again, we are not persuaded.

WWW points first to the undisputed fact that the parties had entered into written distribution agreements that were no longer in place as of 1993. But, WWW and Primarque continued to do business with each other thereafter. Thus, we do not see how the existence of those prior written agreements is preclusive of a finding that the parties' subsequent, extensive course of dealing created an implied-in-fact agreement.

In a related vein, WWW points to the undisputed fact that Primarque had, in 2009 and 2010, requested that WWW enter into an express agreement with it which would have required WWW to give Primarque "1 year notice in the event WWW wants to discontinue selling [certain] products . . . to Primarque" or if WWW decided to sell its business, and that WWW resisted these overtures. But, WWW's rejection of the proposed one-year notice term does not demonstrate that the parties had reached "an agreement dispensing with" the "reasonable notification" term imputed by Mass. UCC § 2-309(3). Id. (emphasis added). Thus, this evidence, too, would not preclude a reasonable juror from finding that the parties had

an implied-in-fact distribution contract subject to Mass. UCC § 2-309(3).[7]

WWW separately asserts, in a single sentence, that there was an "absence of evidence of a distribution agreement in this case." But, WWW does not attempt to grapple with the course-of-dealing evidence that was before the jury. That evidence included the evidence purporting to show that WWW had continuously supplied Primarque with soup base products over the course of nearly four decades; that Primarque was allowed to resell these products under WWW's label "Cook's Delight"; that the parties had a close working relationship that involved sharing potentially sensitive business information, particularly as it concerned the Drop Ship Customers; and that WWW had previously referred to Primarque, which distributed the majority of the soup base products it manufactured, as its "distributor."[8] Thus, even if we were inclined to read this

---

[7] Similarly, the District Court's ruling at summary judgment that the parties had no "meeting of the minds" on the oral agreements alleged by Primarque, including the allegation that "WWW orally promised to give 90 days' notice of its intent to end the parties' distributorship arrangement," Primarque, 303 F. Supp. 3d at 205, did not purport to preclude the jury from finding, as it reasonably did, that the parties had a distribution contract, by virtue of their course of dealing, which was subject to Mass. UCC § 2-309(3), and that the parties had not reached an agreement dispensing with the imputed reasonable notice of termination term.

[8] WWW also developed no argument in its opening brief to us -- or, for that matter, in its motions for judgment as a matter of law to the District Court -- that the District Court improperly precluded it from putting on evidence relevant to the jury's determination about the significance of the parties' course of

cursory assertion about the state of the evidence as a contention that the course-of-dealing evidence presented during trial was too thin to permit a reasonable juror to determine that the parties had an implied-in-fact distribution contract, the argument is insufficiently developed and so is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[T]he settled appellate rule [is] that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**4.**

Finally, WWW contends that the District Court erred in denying its motion for judgment as a matter of law on Primarque's breach of contract claim because, even if there was an enforceable contract between the parties with an imputed reasonable notice of termination term, WWW is still not liable.[9] WWW advances two distinct arguments on this front.

First, WWW argues that the trial evidence indisputably established an antecedent breach of this same term by Primarque. Here, WWW points to undisputed evidence that Primarque was working

---

dealing, and WWW similarly has not identified any evidence about the course of dealing that WWW intended to but was unable to present to the jury.

[9] As before, we decline to address Primarque's suggestion that WWW waived this argument, given our disposition of the merits. See Leavitt, 925 F.2d at 517.

- 23 -

with WWW's competitors back in 2014. WWW characterizes this conduct as Primarque "taking steps to replace WWW as its supplier without notification." (emphasis added). WWW argues that such "taking steps" constituted a breach by Primarque of its obligation to provide reasonable notice to WWW -- assuming that a contract imposing that obligation was in place by implication. On that basis, WWW contends that it was excused from having to comply with the reasonable notice obligation, in the event that such an obligation existed.[10]

But, the District Court determined at the summary judgment stage that the record sufficed to permit a reasonable juror to find that the parties' course of dealing established that "Primarque was not obligated to buy its soup base exclusively from WWW" and that "WWW was aware that Primarque purchased soup base from other suppliers." Primarque, 303 F. Supp. 3d at 192. Moreover, the District Court similarly determined at the summary judgment stage that the record permitted a reasonable juror to find that Primarque was continuing to make substantial purchases from WWW when WWW terminated the parties' relationship. Id. at 201-02. Indeed, the District Court explained in that regard that

---

[10] WWW does not argue on appeal that its obligation to comply with the reasonable notice term imputed by Mass. UCC § 2-309(3) was excused by virtue of Primarque's having breached any other aspect of the parties' implied-in-fact distribution agreement, aside from Primarque's purported antecedent breach of the reasonable notice of termination term.

the record supportably showed that: in 2013, before Primarque reached out to WWW's competitors, Primarque had purchased approximately $1,254,674.56 in soup base products from WWW; in 2014, the year when Primarque began working with those competitors, it still purchased $1,313,175.59 of soup base products from WWW (a $60,000 increase from 2013); and then from February 6, 2015 to March 12, 2015 -- "the last monthly period that WWW sold soup base to Primarque" -- Primarque purchased $97,843.22 of soup base products from WWW, an amount which, if annualized, constituted around 89% of Primarque's total purchases from 2014. See id.

WWW makes no argument that the record fails supportably to show as much. For that reason, we see no basis for rejecting the conclusion that a reasonable juror could find that in early 2015 Primarque was continuing to purchase substantial amounts of soup base products from WWW -- albeit around 11% less than it had purchased in 2014 -- and that the parties' implied-in-fact contract was not one that precluded Primarque from working with other suppliers, because it was not an exclusive arrangement. Thus, we also see no basis for concluding that the record indisputably showed that Primarque's "taking steps" to line up alternative suppliers in 2014 itself constituted "termination" of the parties' implied-in-fact distribution agreement, such that Primarque was obligated to give WWW reasonable notice before engaging with them. See Mass. UCC § 2-309(3); Primarque, 368 F. Supp. 3d at 197-98.

- 25 -

Second, WWW contends that its provision of same-day notice was reasonable under the circumstances. But, here, again, we agree with the District Court that a reasonable juror could have found on this record that WWW's provision of same-day notice of termination was unreasonable under the circumstances. See Primarque, 368 F. Supp. 3d at 197-98; see also, e.g., Cherick Distribs., Inc. v. Polar Corp., 669 N.E.2d 218, 220 (Mass. App. Ct. 1996) (affirming jury's conclusion "that four days' notice was unreasonable" under § 2-309(3)).

In challenging that conclusion, WWW emphasizes that "the reasonableness of the notice of termination is measured in terms of the amount of time 'as will give the other party reasonable time to seek a substitute arrangement.'" RGJ Assocs., Inc. v. Stainsafe, Inc., 300 F. Supp. 2d 250, 254 (D. Mass. 2004) (emphasis omitted) (quoting Mass. UCC § 2-309, Comment 8). But, even so, a reasonable juror could have determined on this record -- especially in light of the evidence of Primarque's substantial ongoing purchases from WWW -- that Primarque did not as of March 2015 have adequate substitute arrangements in place. And, given that WWW's notice immediately terminated the parties' business relationship, it cannot be said that a reasonable juror would have had to have found that notice of that sort afforded Primarque a reasonable amount of time to secure such alternative arrangements.

In contending otherwise, WWW relies on Teitelbaum v. Hallmark Cards Inc., 520 N.E.2d 1333 (Mass. App. Ct. 1988). It argues that precedent provides support for its contention that its day-of-termination notice was necessarily reasonable, because it is undisputed that Primarque had been working with other suppliers prior to the notice being given.[11] WWW points, in particular, to Teitelbaum's statement that if a "party is able to obtain another supplier before the performance of the party effecting termination becomes due, then it necessarily follows that the terminating party has furnished reasonable notice and will not be responsible for damages." Id. at 1336.

But, the relevant question is not whether Primarque dealt with any other suppliers and thus could have found other suppliers post-termination. The relevant question is whether Primarque could have obtained an alternative supplier post-termination -- i.e., another one (or ones) that could replace WWW, taking into account the extent of business that Primarque was doing with it. Cf. id. at 1337 ("The evidence [wa]s uncontroverted that, . . . [t]he plaintiffs did not incur harm for lack of a

---

[11] To the extent Primarque contends that WWW waived this specific point by raising it only at summary judgment and then in its renewed motion for judgment as a matter of law under Rule 50(b), we find, as before, that we do not need to address that contention, given that WWW's position "is wrong on the merits." Leavitt, 925 F.2d at 517.

supplier," as the plaintiffs "had [already] acquired a <u>full line of inventory</u> . . . ." (emphasis added)).[12]

Indeed, <u>Teitelbaum</u> itself observes that "[i]n many cases, the issue of the adequacy of notice of termination will present a jury question," as "the adequacy of the notice is generally coextensive with the amount of harm that can be proved by the party who has incurred the loss of a supplier." <u>Id.</u> at 1336-37. We thus agree with the District Court that this case "present[ed] a jury question," <u>id.</u> at 1336, and that the jury's determination as to the unreasonableness of WWW's day-of-termination notice was not itself unreasonable, see <u>Primarque</u>, 368 F. Supp. 3d at 197-98.

### B.

WWW also takes aim at the District Court's denial of its motion for judgment as a matter of law on Primarque's tortious interference with business relations claim. As the District Court explained in instructing the jury, "Primarque alleged [in support of this claim] that WWW improperly interfered with [Primarque's] business relations with its Drop Ship Customers by abruptly terminating the parties' distributorship agreement without reasonable notice, which left [Primarque] no time to secure another

---

[12] Even if <u>Teitelbaum</u> were susceptible to WWW's reading of it, it is not an opinion of the Supreme Judicial Court of Massachusetts and, in consequence, would not constitute binding authority here. See <u>Vt. Mut. Ins. Co.</u> v. <u>Zamsky</u>, 732 F.3d 37, 42 (1st Cir. 2013).

- 28 -

supplier to fulfill its obligations to [the Drop Ship] Customers."
See also Primarque, 368 F. Supp. 3d at 199. And, in the course of
returning a verdict in Primarque's favor on that claim, the jury
found that "WWW intentionally and improperly interfere[d] with
Primarque's advantageous business relations with its drop ship
customers"; that "WWW's intentional and improper interference with
Primarque's relationship with its drop ship customers induce[d]
such customers to stop doing business with Primarque and cause[d]
Primarque to suffer damages"; and that Primarque was therefore
entitled to $204,000 in lost-profit damages.

WWW contends on appeal that the District Court erred in
denying its motion for judgment of law as to the tortious
interference with business relations claim because "WWW's
cessation of [the] business relationship was not tortious as a
matter of law."[13] Our review is de novo. See Hendricks, 923 F.2d
at 214.

WWW's premises this contention, however, on its
insistence that "WWW was under no legal obligation to provide
Primarque with notice." Indeed, WWW concedes that if a reasonable
juror could have "found that WWW prematurely ended its relationship
with Primarque," then it "could find [that] WWW tortiously

_____

[13] Primarque suggests that WWW waived this argument, too, in
failing to object to a particular jury instruction, but we do not
address that suggestion given our disposition of the merits. See
Leavitt, 925 F.2d at 517.

interfered."  Thus, this challenge fails, too, because, as we have just explained, a reasonable juror could have found that WWW was under a legal obligation to provide Primarque with reasonable notice of termination.  See Mass. UCC § 2-309(3).

## C.

WWW's last challenge in its cross-appeal is that the District Court erred in denying its motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) to reduce Primarque's $204,000 tortious interference award to, at most, $39,000.  That latter amount represents, according to WWW, "the amount of Primarque's lost profits over the 90-day period after March 12, 2015," which is the date on which WWW terminated the parties' business relationship.

In rejecting WWW's motion in this regard, the District Court explained that it concluded that the jury intended to award Primarque "tortious interference damages represent[ing] one year of lost profits," Primarque, 368 F. Supp. 3d at 199, on the theory that Primarque had suffered damages after "WWW unreasonably terminated the parties' distributorship arrangement without [adequate] notice and as a result . . . [Primarque] couldn't fulfill its obligations to its" Drop Ship Customers, id. at 198.  Our review is for abuse of discretion.  See Marie, 402 F.3d at 7 n.2 ("[G]rants and denials of Rule 59(e) motions are reviewed only

for abuse of discretion." (citing Venegas-Hernandez, 370 F.3d at 190)). We find none.

WWW argues that the District Court erred here because the jury found that Primarque's right to reasonable notice of termination required WWW to give notice of termination ninety days in advance and, in consequence, any damages for profits lost after the ninety-day notice period ended "were too speculative [for Primarque] to recover." That is so, WWW contends, because, after those ninety days, WWW would have been free, in any event, to stop selling soup base products to Primarque and also to compete directly with it for the business of the Drop Ship Customers. Accordingly, in WWW's view, it is "pure speculation to presume that Primarque would have retained all of the [same] customers beyond [ninety] days and sold the same amount of soup bases to those customers for a year."

Massachusetts law is clear, however, that "[i]n the case of business torts, an element of uncertainty in the assessment of damages is not a bar to their recovery." Zimmerman v. Bogoff, 524 N.E.2d 849, 856 (Mass. 1988) (alterations omitted) (quoting Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 196 (Mass. 1986)). This is "especially" true, moreover, "in circumstances in which the wrongdoer's conduct has caused the uncertainty of the measurement." A.C. Vaccaro, Inc. v. Vaccaro,

955 N.E.2d 299, 306 (Mass. App. Ct. 2011) (citing Air Tech. Corp. v. Gen. Elec. Co., 199 N.E.2d 538 (Mass. 1964)).

Against that legal backdrop, we cannot say, as WWW contends, that the jury's verdict as to the amount of Primarque's lost profit attributable to WWW's abrupt termination was "entirely without foundation," Atl. Rsch. Mktg. Sys., Inc. v. Saco Def., Inc., 997 F. Supp. 159, 170 (D. Mass. 1998), let alone that the District Court abused its discretion in failing to grant WWW's Rule 59(e) motion on that basis. WWW is correct that it is possible that Primarque would have lost some of the Drop Ship Customers' business in less than a year even if WWW had given timely notice of termination. That bare possibility, however, does not suffice to render the jury's award speculative or even necessarily overly favorable to Primarque. See Rombola v. Cosindas, 220 N.E.2d 919, 922 (Mass. 1966) ("While it is possible that no profits would have been realized . . . that possibility is inherent in any business venture. It is not sufficient to foreclose [the plaintiff's] right to prove prospective profits."). That is especially so in light of the competing possibility that Primarque could have retained the Drop Ship Customers' business for more than one year and the fact that, in any event, a juror could reasonably have found that WWW's tortious conduct "caused the uncertainty of the measurement." A.C. Vaccaro, 955 N.E.2d at 306.

- 32 -

In addition, WWW does not argue on appeal that the $204,000 figure is an inaccurate estimate of the profit that Primarque would have earned over the course of a year if it had continued making similar sales to the Drop Ship Customers for that length of time. Indeed, WWW's own witnesses testified that this figure -- which was based on the sales that Primarque and then WWW had made to the Drop Ship Customers from January 1 to December 31, 2015, as well as the price that Primarque had been charging those customers for those products prior to WWW's termination of their business relationship -- was accurate at least to that extent. Thus, the District Court did not abuse its discretion in denying WWW's Rule 59(e) motion to reduce Primarque's award to $39,000.

## IV.

We turn our attention, then, to Primarque's appeal. We start with Primarque's first challenge to the District Court's rulings below.

## A.

Primarque contends that the District Court erred in partially granting WWW's Rule 59(e) motion to strike the jury's $51,000 award on Primarque's breach of contract claim as duplicative of its $204,000 award on Primarque's tortious interference with business relations claim. The District Court reasoned as follows in striking the $51,000 award as duplicative. The jury intended to award Primarque damages amounting to lost

- 33 -

profits on the tortious interference with business relations claim incurred over the course of the year that followed the termination the implied-in-fact agreement, which totaled $204,000 and is the amount that the jury awarded on that claim. The jury also intended to award Primarque lost profits for the first ninety days of that same year on the breach of contract claim, as its award here was $51,000 and happens to be one-quarter of $204,000 (and thus, in the District Court's understanding of the jury's intent, one quarter of the profits lost over the course of the year). See Primarque, 368 F. Supp. 3d at 199.

But, the District Court reasoned, that being so, Primarque was necessarily being compensated twice by the jury's damages award for the profits that it had lost during the first ninety days of the one-year period that followed WWW's termination of the parties' agreement. See id. The District Court then separately determined that the most damages to which Primarque could have been entitled to on its breach of contract claim was $39,017. See id. at 198 & n.4. In doing so, it concluded that a reasonable juror could have found, at most, that this was the amount of Primarque's lost profit during the ninety-day reasonable notice period following March 12, 2015. See id. at 198. It then proceeded to vacate the entirety of the breach of contract award given that, in its view, even this smaller amount remained duplicative. See id. at 198-200, 200 n.5.

We review the District Court's partial grant of WWW's Rule 59(e) motion for abuse of discretion. See Marie, 402 F.3d at 7 n.2 (citing Venegas-Hernandez, 370 F.3d at 190). But, this "abuse of discretion review is superimposed on the standard of review the Rule 59(e) judge exercises over the original judgment," Venegas-Hernandez, 370 F.3d at 190, pursuant to which "a district court may set aside a jury's verdict . . . only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice," Sanchez v. P.R. Oil Co., 37 F.3d 712, 717 (1st Cir. 1994). And, to the extent that the District Court's decision was predicated on the resolution of legal questions, we review its resolution of those questions de novo. See Rio Mar Assocs., LP, SE v. UHS of P.R., Inc., 522 F.3d 159, 163 (1st Cir. 2008).

The jury was instructed that it could not award damages for lost profits on the breach of contract claim that were incurred beyond the reasonable notice period, not to exceed ninety days, following the termination. But, significantly, it was not instructed that there was any set temporal bound for the period for which damages for lost profits could be awarded on the tortious interference with business relations claim. Moreover, Primarque notes, correctly, that courts generally "presume[]" that "jurors . . . follow the trial court's instructions," id. at 163, and that the District Court had instructed the jury at length that

- 35 -

it could not award Primarque "duplicative damages" during the reasonable notice period on both the tortious interference with business relations and breach of contract claims.[14]

Thus, we find persuasive Primarque's contention that the jury could be understood to have intended for the $51,000 damages award to cover profits lost during the first ninety days following WWW's breach of the contract and the $204,000 damages award to cover the profits lost in the one-year period that followed the end of those ninety days and that were attributable to WWW's tortious interference with business relations. Indeed, Primarque's counsel during closing argument asked the jury for as much as three years and two months' worth of lost-profit damages

---

[14] The relevant instruction read in full:

> A plaintiff, such as Primarque, may seek recovery under multiple counts, but may not recover duplicative damages that arise out of the same act or conduct . . . . Thus, in this case, Primarque may not recover twice for the same injury in both contract and tort. Accordingly, if you find that Primarque is entitled to a verdict on both, the breach of contract claim sounding in contract law based on WWW's same day notice of termination, you may not also compensate Primarque on its tortious interference with advantageous business relations claim based on that same underlying . . . conduct. However, if you find that Primarque suffered damages under its tortious interference with advantageous business relations for some period beyond the reasonable notice period, then you may compensate it for lost profit damages if proved and if sustained for a period which exceeds the reasonable notice period.

on that latter claim -- stressing evidence which indicated that Primarque had continued to lose sales to the Drop Ship Customers from March 2015 through May 2018 at a rate of about $204,000 a year -- and then called for the jurors to "use your collective judgment" to determine "how long into the future [Primarque] reasonably would have kept [its lost] customers" had it been given reasonable notice of termination.

Given that "[o]n this record, there is no way to determine what the jury [actually] did," Ramos v. Davis & Geck, Inc., 224 F.3d 30, 32 (1st Cir. 2000), we cannot agree with the District Court that it is "evident" that the jury ran afoul of its well-crafted instructions on avoiding duplicative damages, Primarque, 368 F. Supp. 3d at 199.[15] Instead, "[a]pplying the instruction[s] to the facts of this case, [we conclude that] the

_____

[15] It is true that the District Court also observed -- and Primarque does not dispute on appeal -- that the jury erroneously awarded Primarque $51,000 in damages on its breach of contract claim rather than $39,017, despite trial evidence establishing that the latter amount was the actual amount of Primarque's lost profits during the ninety-day period following WWW's breach. See Primarque, 368 F. Supp. 3d at 199. But, even accepting the District Court's unchallenged determination that the jury erred in the computation of Primarque's breach of contract damages, that error does not in itself provide a reason to think that, in separately awarding Primarque $204,000 on its tortious interference with business relations claim -- an amount which the parties agree represents the profit that Primarque would have earned had it continued to sell to the Drop Ship Customers over a period of one year -- the jury thereby concluded that Primarque would have continued to transact with the Drop Ship Customers for only nine months after the end of the reasonable notice period rather than twelve.

verdict must be presumed to have" accounted for them.  Rio Mar Assocs., 522 F.3d at 163.  And, with that presumption in place, the $51,000 award of damages to Primarque on its breach of contract claim was not duplicative of the damages awarded to it on its tortious interference with business relations claim.  However, because Primarque does not dispute that it was entitled to at most $39,017 in breach of contract damages, see Primarque, 368 F. Supp. 3d at 198 & n.4, we direct the District Court to reinstate the jury's verdict only to that extent.

**B.**

Primarque next challenges the District Court's decision to deny its Rule 59(e) motion to alter or amend the judgment and thus to award Primarque prejudgment interest on its $204,000 damages award on its tortious interference with business relations claim.[16]  We review "the district court's determination regarding the award of prejudgment interest . . . for abuse of discretion, 'but legal issues relating to the prejudgment interest award are reviewed de novo.'"  Companion Health Servs. v. Kurtz, 675 F.3d

---

[16] The District Court concluded that Primarque would be entitled to prejudgment interest on its breach of contract claim to the extent that any damages on that claim were not duplicative of those awarded on the tortious interference with business relations claim.  See Primarque, 368 F. Supp. 3d at 200 & n.5.  We do not address that ruling here, as neither party asks us to revisit it on appeal.

75, 87 (1st Cir. 2012) (quoting Analysis Grp., Inc. *v.* Cent. Fla. Inv., Inc., 629 F.3d 18, 24 (1st Cir. 2010)).

"When a plaintiff obtains a jury verdict in a diversity case in which the substantive law of the forum state supplies the rules of decision, that state's law governs the plaintiff's entitlement to prejudgment interest." Crowe, 365 F.3d at 90. Under Massachusetts law, the "fruits of [a] state-law victory" generally "include[] prejudgment interest, to be added ministerially after the verdict, not factored into the jury calculus." Foley v. City of Lowell, 948 F.2d 10, 17 (1st Cir. 1991) (citing Mass. Gen. Laws ch. 231, § 6B).

Here, the District Court, applying Mass. Gen. Laws ch. 231, § 6B (hereinafter "§ 6B"),[17] determined that Primarque's $204,000 tortious interference award did not qualify for prejudgment interest because "substantially all of the damages on this claim occurred after the suit was filed," and § 6B did not

_____

[17] This statute provides:

> In any action in which a verdict is rendered . . . for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

Mass. Gen. Laws ch. 231, § 6B.

- 39 -

allow a court to award prejudgment interest as "compensat[ion] for future losses." Primarque, 368 F. Supp. 3d at 200 (quoting Casual Male Retail Grp., Inc. v. Yarbrough, 527 F. Supp. 2d 172, 181 (D. Mass. 2007)); see also Casual Male Retail, 527 F. Supp. 2d at 181 ("[§ 6B] was not intended to award interest on damages accruing after the filing of the action," i.e., "when damages are awarded to compensate for future losses." (citing Conway v. Electro Switch Corp., 523 N.E.2d 255 (1988))).

In particular, the District Court explained, WWW's termination of the parties' distribution contract "occurred on or about March 12, 2015," and "Primarque commenced this action 7 days later, on March 19, 2015," Primarque, 368 F. Supp. 3d at 200 -- which meant that almost the entirety of the $204,000 award concerned profits lost after Primarque commenced its suit (although before the District Court entered judgment), see id.

Primarque contends, however, that the District Court's decision rests on a misconception of what constitutes nonrecoverable "future losses" under § 6B. The District Court's decision was based on Conway v. Electro Switch Corp., a 1988 decision in which the Massachusetts Supreme Judicial Court explained that a litigant could not receive prejudgment interest under § 6B on damages awarded for harms that would occur after "the date of judgment." 523 N.E.2d at 259 (emphasis added); see also id. at 258-59 (explaining that it would be improper to add

- 40 -

prejudgment interest to a jury's award of "front pay" in an employment discrimination case, because such "damages . . ., by definition, are for losses to be incurred in the future," and § 6B "cannot reasonably be said to apply to an award of damages based upon lost earnings and benefits occurring after the date of judgment"). Conway, however, did not suggest that "future losses" for which prejudgment interest could not be awarded also included losses incurred after a complaint was filed but prior to judgment. Indeed, such an understanding of § 6B -- pursuant to which a litigant would be unable to recover interest on damages sustained prior to judgment but after the filing of suit -- cannot be squared with what Conway called "the fundamental proposition that interest is awarded to compensate a damaged party for the loss of use or the unlawful detention of money," id. at 258, as such monies, in the normal course, continue to be withheld from the party damaged until the entry of judgment. The District Court's position, moreover, would risk incentivizing needless delay on the part of a plaintiff in the filing of otherwise meritorious claims, or protraction of litigation once filed on the part of a defendant, and we do not read § 6B or Conway to support such a result. See also Charles D. Bonanno Linen Serv., Inc. v. McCarthy, 550 F. Supp. 231, 246-47 (D. Mass. 1982) (rejecting argument that "§ 6B does not apply to damages for losses accruing after commencement of the action," as "it is more reasonable to read the legislative

prescription as one applying to all tort damages, whether for losses accruing before or for losses accruing after the date of commencement of the action"), aff'd in relevant part, 708 F.2d 1, 12 (1st Cir. 1983) ("We think the district court correctly applied [§ 6B].").

Here, judgment did not enter until June 1, 2018, meaning that the $204,000 award intended to compensate Primarque for profits lost between 2015 and 2016 was not a nonrecoverable "future loss" under the reasoning of Conway. Thus, we conclude that the District Court committed legal error in holding that Primarque was not entitled to prejudgment interest on its tortious interference with business relations claim, and so we reverse to that extent its denial of Primarque's Rule 59(e) motion. Because this same error may have affected the District Court's evaluation of Primarque's "offset" request, see Primarque, 368 F. Supp. 3d at 199-200, we also vacate its decision denying that request.

## C.

Primarque's final argument on appeal is that the District Court erroneously granted summary judgment to WWW on Primarque's Chapter 93A claim. We review the District Court's grant of summary judgment de novo, McCue v. Bradstreet, 807 F.3d 334, 340 (1st Cir. 2015), keeping in mind that "[s]ummary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a

matter of law," <u>Vives</u> v. <u>Fajardo</u>, 472 F.3d 19, 21 (1st Cir. 2007) (citing Fed. R. Civ. P. 56(c)).

As the District Court noted, Chapter 93A proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," <u>Primarque</u>, 303 F. Supp. 3d at 208 (alteration omitted) (quoting Mass. Gen. Laws ch. 93A, § 2)), and "[a] practice is unfair if it falls 'within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen,'" <u>id.</u> (quoting <u>Linkage Corp.</u> v. <u>Trs. of Bos. Univ.</u>, 679 N.E.2d 191, 209 (Mass. 1997)). And, as the District Court recognized, whether "an act or practice is 'immoral, unethical, oppressive or unscrupulous' is the kind of fact-specific determination generally left for a jury." <u>Id.</u> at 208-09 (citing <u>First Choice Armor & Equip., Inc.</u> v. <u>Toyobo Am., Inc.</u>, 839 F. Supp. 2d 407, 415 (D. Mass. 2012)); see <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 582 F.3d 156, 184 (1st Cir. 2009) ("Massachusetts courts 'evaluate unfair and deceptive trade practice claims based on the circumstances of each case,' leaving 'the determination of what constitutes an unfair trade practice to the finder of fact.'" (quoting <u>Mass. Eye & Ear Infirmary</u> v. <u>QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 69 (1st Cir. 2009))). But, in awarding summary judgment to WWW, the District Court concluded

- 43 -

-- in summary fashion -- that "Primarque has not come forward with a scintilla of evidence that WWW engaged in any unfair, or deceptive act or practice." Primarque, 303 F. Supp. 3d at 209.

We agree with Primarque, however, that the District Court's decision was an erroneous one, as Primarque did in fact put forward sufficient evidence to create a jury question on the issue of whether WWW's conduct was "unfair" within the meaning of Chapter 93A. In particular, we find, the evidence precluding summary judgment on this claim was the same evidence that Primarque had put forward in support of submitting its breach of contract and tortious interference with business relations claims to the jury, as Massachusetts law is clear that an unreasonably abrupt termination of a distribution contract can constitute an "unfair" act under Chapter 93A no less than it can ground a breach of contract or tortious interference with business relations claim. See Cherick Distribs., 669 N.E.2d at 220-21 ("The same evidence that supported the jury's findings of a breach of the covenant of good faith and fair dealing" -- namely, the defendant's "abrupt termination of the distributorship agreement" -- "also supported the jury's finding that [the defendant's] conduct amounted to an unfair or deceptive act under G.L. c. 93A."); see also, e.g., Anthony's Pier Four v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991) ("We have said that conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the

- 44 -

breaching party constitutes an unfair act or practice for c. 93A purposes." (quoting Wang Lab'ys, Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1165 (Mass. 1986))); Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997) (explaining that defendant's "repudiat[ion of] binding agreements and usurp[ation of plaintiff's] business" could be deemed "unfair" under Chapter 93A). WWW's attempt to distinguish these precedents is unconvincing,[18] and the District Court offered no other rationale to support its summary judgment decision. We are accordingly constrained to reverse the District Court's award of summary judgment to WWW on Primarque's Chapter 93A claim.

**V.**

We **affirm** the District Court's entry of amended judgment in the amount of $204,000 on Primarque's tortious interference with business relations claim. We **reverse** the District Court's grant of summary judgment to WWW on Primarque's Chapter 93A claim; **reverse** its order striking as duplicative the jury's damages award

---

[18] WWW suggests that a different understanding of what counts as an "unfair or deceptive act" should apply where, as here, there was no "express distribution contract," but, in so contending, it neglects the Supreme Judicial Court's holding that a "violation of [an] implied" contractual term can "establish[] as a matter of both fact and law that . . . actions were unfair or deceptive," Anthony's Pier Four, 583 N.E.2d at 822 (emphasis added). Similarly, WWW's contention that Primarque "worked in the shadows" and that its actions amounted to "secretly . . . transitioning business from [WWW] to [WWW's] competitors" fails to establish that a reasonable juror could not have viewed WWW's conduct as "unfair or deceptive."

on Primarque's breach of contract claim, and further direct the District Court to reinstate an award of $39,017 in damages as to that claim; **<u>reverse</u>** its order denying Primarque prejudgment interest on the $204,000 damages award that Primarque received on the tortious interference with business relations claim; **<u>vacate</u>** its order denying Primarque's offset request; and **<u>remand</u>** for further proceedings consistent with this opinion. Costs are awarded to the appellant.